Mr. Justice Bradley
delivered the opinion of the court:
The title to a well-known watering place in the State of Arkansas, called the Hot Springs, now located in Hot Springs County, has been contested by a number of claimants for nearly half a century. These springs are situated in a narrow valley or ravine between two rocky ridges in one of the lateral ranges of tlie Ozark Mountains, about sixty miles to the westward of Little Bock. Though not easily accessible, and in a district of country claimed by the Indians until after the treaty made with the Quapaws in 1818, they were considerably frequented by invalids and others as early as 1810 or 1812 ,• but no permanent settlement was made at the place until a number of years afterward. Temporary cabins were erected by visitors, and by those who resorted there to dispose of articles needed by visitors, but were only occupied during a portion of the year. The public surveys were not extended to that portion of the country until 1838.
In order to settle, if possible, the controversies which existed, and which seemed interminable, none of the parties having any regular Government title, and it being doubtful whether any of them were entitled thereto, Congress, on the 31st day of May, 1870, passed the following act:
“ AN ACT in relation to tlie Hot Springs reservation in Arkansas.
uBe it enacted by the Senate and Souse of Representatives of *306 the United States of America in Congress assembled, That any person claiming title, either legal or equitable, to the whole or any part of the four sections of land constituting what is known as the Hot Springs reservation in Hot Springs County, in the State of Arkansas, may institute against the United States in the Court of Claims, and prosecute to final decision, any suit that may be necessary to settle the Same: Provided, That no such suits shall be brought at any time after the expiration of ninety days from the passage of this act, and all claims to any part of said reservation upon which suit shall not be brought under the provisions of this act within that time shall be forever barred.
“ Sec. 2. And be it further enacted, That all such suits shall be by petition in the nature of a bill in equity, and shall be conducted and determined in all respects, except as herein otherwise provided, according to the rules and principles of equity practice and jurisprudence in the other courts of the United States; and for the purposes of this act the Court of Claims is hereby invested with the jurisdiction and powers exercised by courts of equity so far as may be necessary to give full relief in any suit which may be instituted under the provisions of this act.
“Sec. 3. And be it further enacted, That notice of every suit authorized by this act shall be executed by the delivery of a true copy thereof, with a copy of the petition, to the Attorney-General, whose duty it shall be, for and in behalf of the United States, to demur to or answer the petition therein, within thirty days after the service of such process upon him, unless the court shall for good cause shown grant further time for filing the same.
“ Sec. 4. And be it further enacted, That if two or more parties claiming the same lands under different titles shall institute separate suits under the provisions of this act, such suits shall be consolidated and tried together, and the court shall determine the question of title and grant all proper relief as between the respective claimants as well as between each of them and the United States.
“ Sec. 5. And be it further enacted, That if, upon the final hearing of any cause provided for in this act, the court shall decide in favor of the United States, it shall order such lands into the possession of a receiver, to be appointed by the court, who *307 shall take charge of and rent out the same for the United States until Congress shall by law direct how the same shall be disposed of, which said receiver shall execute a sufficient bond, to be approved by the court, conditioned for the faithful performance of his duties as such, render a strict account of the manner in which he shall have discharged said duties, and of all moneys received by him as a receiver as aforesaid, which shall be by said court approved or rejected accordingly as it may be found correct or not, and pay such moneys into the Treasury of the United States; and he shall receive such reasonable compensation for his services as said court may allow, and in case of a failure of said receiver to discharge any duty devolving upon him as such, the court shall have power to enforce the performance of the same by rule and attachment. But if the court shall decide in favor of any claimant, both as against the United States and other claimants, it shall so decree, and proceed by proper process to put such successful claimant in possession of such portion thereof as he may be thus found to be entitled to, and upon the filing of a certified copy of such decree with the Secretary of the Interior, he shall cause a patent to be issued to the party in whose favor such decree shall be rendered for the lands therein adjudged to him : Provided, That either party may within ninety days after the rendition of any final judgment or decree in any suit authorized by this act, carry such suit by appeal to the Supreme Court of the United States, which court is hereby vested with full jurisdiction to hear and determine the same on such appeal, in the same manner and with the same effect as in cases of appeal in equity causes from the circuit courts of the United States: And provided further, That in case the judgment or decree of the Court of Claims in any such suit shall be adverse to the United States, the Attorney-General shall prosecute such appeal within the time above prescribed; and the taking of an appeal from any such judgment or decree shall operate as a supersedeas thereof until the final hearing and judgment of the Supreme Court thereon.
“J. G. BLAINE,

“ Speaker of the House of Representatives.

“SCHUYLER COLFAX,
“ Vice-President of the United States and President of the Senate.
“Received by the President May 31, 1870.
*308 “[Note ey the Department oe State. — The foregoing act having been presented to the President of the United States for his approval, and not having been returned by him to the House of Congress in which it originated within the time prescribed by the Constitution of the United States, has become a law without his approval.]”
The various parties setting up a claim to the property having, in pursuance of the act, filed their respective petitions in the Court of Claims; and the cases having been consolidated, the court, after a very full investigation, rendered a decree in favor of the United States, and adverse to all the claimants. That decree is brought here by appeal.
Three different titles are set up against the United States; two of them under claims of pre-emption, and one under a New Madrid location.
I. John 0. Hale claims the southwest quarter of section 33, township 2 south, range 19 west of the fifth principal meridian, in Hot Springs County, Arkansas, embracing the Hot Springs, which are the object of contention. He claims as representative of John Percifull by right of pre-emption under the fifth section of the act of Congress passed April 12, 1814, entitled uAn act for the final adjustment of land-titles in the State of Louisiana and Territory of Missouri.” By this section it was provided, among other things, that every person, and the legal representatives of every person, who had actually inhabited and cultivated a tract of land lying in the Territory of Missouri not rightfully claimed by any other person, and who should not have removed from the Territory, should be entitled to the right of pre-emption in the purchase thereof, under the same restrictions and regulations as directed in a similar act, passed February 5, 1813, in relation to Illinois. Those restrictions and regulations were that the price should be the same as that of other public lands in the Territory, that only one quarter-section should be thus sold to one individual, that it should be bounded by the sectional and divisional lines of the public survey, and that the sale should not embrace lands reserved from sale by former acts, or directed to be sold in town-lots, &c. It was further required by the act of 1813 that every person claiming under the act must make known his claim by delivering a notice in writing to the register of the land-office for *309 the district in which the land should lie, designating his claim, and to be filed in the office. If it appeared to the satisfaction of the register and receiver that he was duly entitled, he was allowed to enter the land on payment of one-twentieth of the price; but the entry must be made at least two weeks before the time of the commencement of public sales in the district, or the right would be forfeited.
Hale sets forth in his petition that at the time when the said act was passed, namely, April 12,1814, John Percifull had actually inhabited and cultivated the tract of land embracing the Hot Springs, and forming a portion of the quarter-section cliamed by him; that he had settled upon tbe same as early as 1809, and had continued to reside thereon and cultivate the same up to the time of the passage of the act; but that he could not comply with the act as to making entry, &c., because the land was not publicly surveyed until the year 1838. That as soon as practicable after the survey was made, namely, on the 27th of September, 1838, Sarah and David Percifull, the widow and heir-at-law of John Percifull, (who was then deceased,) gave notice of the said claim, verified by affidavits, to the register of the proper land-office at Washington, Ark., and applied to the register and receiver to enter the same, but that their application was rejected. That this decision of the register and receiver was subsequently confirmed by the Commissioner of the General Land-Office, on the ground that the Hot Springs, and four sections of land around the same, had been reserved for the future disposal of the United States by an act of Congress passed April 20, 1832.
The act of 1832, referred to, was an act authorizing the governor of Arkansas Territory to lease the salt-springs therein. By the third section of the act it was enacted that the Hot Springs in said Territory, together with four sections of land including said springs, as near the center thereof as may be, shall be reserved for the future disposal of the United States, and shall not be entered, located, or appropriated for any other purpose whatever.
Besides this act, which the claimant had to contend with, the Indian title to that portion of the country was not extinguished until August 24, 1818, when it was ceded to the United States by the treaty made with the Quapaws. Attorney-General Butler, in 183(5, being applied to for his opinion on the subject, held *310 that none of the lands ceded by that treaty were, or ever had been, subject to pre-emption claims under the act of 1814, because no settlement or cultivation of the lands prior to that act could have been made consistently with the rightful claims of others, namely, the Quapaw Indians. The land department always acted in conformity with this opinion. And it is difficult to see how a different result could have been reached. It was the declared policy of the Government at an early day to prohibit any settlement of lands belonging to the Indians. A proclamation to this effect was issued by the old Congress September 22, 1783. (Journals, vol. 4, p. 275; Land Laws, 1828, p. 388.) An enactment of the same purport was made by Congress in 1802 in the act to regulate trade and commerce with the Indians, section 5. (2 Stat. L., 141,142.) After the acquisition of Louisiana, it was repeated in reference to that Territory. (Act March 26, 1804, 2 Stat. L., 289.)
But it is contended that this difficulty has been obviated by the Act March 1,1843, (5 Stat. L., 603,) passed to perfect the titles of land south of the Arkansas River, held under New Madrid locations and pre-emption rights, especially in reference to the Indian title. By the third section of this act it was enacted that every settler on the public lands south of the Arkansas River should be entitled to the same benefits accruing under the act of 1814 as though they had resided north of said river. What does this mean ? We know the fact that the lands north of the Arkansas had been ceded to the United States by the Great and Little Osages by the treaty of 1808, and that the Indian title, therefore, was extinguished in 1814. Does the act mean that the settlers south of the river should have the same benefit as if the Indian title had been extinguished in and prior to 1814 ? If it meant this, why did it not say it1? But supposing that the act had this effect, so that the objection arising from the Indian title was removed, the act still left unshaken the reservation made by the act of 1832. This act is absolute in its terms. It contains no saving clause. It declares that the Hot Springs shall be reserved for the future disposal of the United States, and that they shall not be entered, located, or appropriated for any other purpose whatever. This positive prohibition would have prevented the representatives of Per-cifullfrom availing themselves of any benefit which the removal *311 of the obstacle arising from the Indian title gave them. Entry and location were still necessary to give them title.
The counsel for Hale, however, strenuously contends that the act of 1843 was intended to validate the pre-emption claim of Pereifull to the property in question; and that it must be construed to effect a repeal of the act of 1832 by implication. In favor of this view he alleges as a fact that this was the only case to which the act could apply. We cannot know this. There is nothing on the face of the act to indicate it. If it was intended to repeal the act of 1832, and to confirm Percifull’s title, why was it not so expressed ? A plain word or two would have done it. If such had been the legislative intent, we cannot believe that this intent would have been left in such deep obscurity, and dependent on so many implications. The act of 1832 expressed very clearly the intent of Congress to reserve the Hot Springs from private appropriation. If the act of 1843 was intended to revoke this reservation, it ought to have been expressed with like clearness.
But besides these legal obstacles in the way of this claim, it is not clear, from the evidence, that Pereifull came within the description of the act of 1814. He resorted to the Hot Springs temporarily, during the visiting season, to deal in such articles as the persons who frequented-the place for their health needed. When they left he left. If he erected shanties or cabins, it was not for the purpose of permanent residence, but for temporary accommodation. His actual residence was several miles distant. There is no clear evidence of an intent on his part, at that time (1814) or previously, to make this retired spot in the Indian country his home.
We think this claim cannot be maintained either at law or in equity. Whatever hardship exists in the case must be submitted to the just consideration of the Government.
II. William H. Gaines and wife, and others, as heirs of one Ludovieus Belding, claim the same quarter-section as is claimed by Hale, by virtue of au alleged residence and settlement on the land in 1829 and 1830, under the Pre.-emption Act May 29, 1830. (4 Stat. L., p. 420.) This was a general act. and declared that every settler or occupant of the public lands prior to its passage, who was then in possession and cultivated any part thereof in the year 1829, might enter with the register of the land-office for the district in which such lauds should lie, *312 by legal subdivisions, any number of acres not more than 160, or a quarter-section, to include his improvements, upon paying to the United States the minimum price; with a proviso that no entry or sale of any land should be made under the act which should have been reserved for the use of the United States, or either of the States. Other provisions of the act as well as that here recited demonstrate that it was only intended to apply to lands which had been publicly surveyed. By its very language it could apply to no other. It evidently did not apply to thelandsin question. They were notsurveyed until 1838. The act contained the further provision that it should remain in force for one year. It ceased to have effect, therefore, on the 29th of May, 1831. On the 20th of April, 1832, the act was passed reserving the Hot Springs. But the heirs of Belding rely on the Act July 14,1832, (4 Stat. L., p. 603,) by which it was declared that all occupants and settlers upon the public lands of the United States, who were entitled to a pre-emption according to the act of 1830, and had not been able to make proof and enter the same within the time limited therein, in consequence of the public surveys not having been made and returned, or where the land was not attached to any land-district, or where the same had been reserved from sale on account of a disputed boundary between any State and Territory, should be permitted to enter said lands on the same conditions, in every respect, as were prescribed in that act, within one year after the surveys were made, &c. It is difficult to see how this act can aid the claimants. The conditions of the act of 1830 are not only not waived, but they are expressly re-imposed. One of those conditions, as seen above, was that no entry or sale of any land should be made which should have been reserved for the use of the United States, or either of the States. This very thing had been done by the reservation of the Hot Springs by the act of 1832. No vested right had accrued to Belding before that reservation, for the pre-emption act of 1830 did not extend to the lands in question until the passage of the act of July, 1832, even if a vested right could be set up against the Government before entry and location. The counsel for the claimants, however, bases an ingenious argument upon’ that phrase in the act reserving the Hot Springs, by which they are reserved ufor the future disposal of the United StatesP He supposes that this differs from a reservation “ to the United StatesAnd as they *313 are only reserved for future disposal, it may well be said that such disposal was made by the act of July 14, 1832, in subjecting them to the right of pre-emption given by the act of 1830. But this argument is too far-fetched and circuitous. In the first place, we think that a reservation for the future disposal of the United States was a reservation to the United States. And, in the next place, that Congress could hardly have entertained an intent to dispose of the Hot Springs reservation by any such general phraseology as that which was employed in the act of July 14, 1832. Certain reservations are expressly referred to in the act as no longer to be in the way of preemption ; and the express mention of these makes the omission of others more emphatic. The argument of the counsel would have the effect of defeating all governmental reservations made between April, 1830, and July, 1832 j for the United States had the power of disposing of all of them, whether expressly retained or not.
Without referring, therefore, to the character of Belding’s occupation, his want of title, either legal or equitable, is manifest upon the face of the statutes under which he claims, taken in connection with the act of April 20, 1832, reserving the property to the Government. If it were necessary to examine his mode of occupation it would be open to some very just criticism, for which it is sufficient to refer to the opinion of the court below. (10 O. Cls. R., 368.)
III. The remaining title is that claimed by Henry M. Rector, (and, under him, Russell,) under a New Madrid location, in right of Francis Langlois. The earthquake, or succession of earthquakes, which occurred along the Mississippi below the mouth of the Ohio in 1811 and 1812, was particularly disastrous to the county and village of New Madrid, in Missouri Territory, (then the district of Louisiana,) leaving a large portion of the land now known as the “ sunk country” under water. For the relief of the inhabitants, Congress, on the 17th of February, 1815, passed an act authorizing those whose lands had been materially injured by earthquakes to locate the like quantity of land on any of the public lands of the said Territory, the sale of which was authorized by law. It was provided, however, that no person should be permitted to locate a greater quantity than he had before, except where that was less than 160 acres, and in no case a greater quantity than 640 acres; *314 and that, in every case where such location should be made according to the provisions of the act, the title of the person or persons to the land injured should revert to and become absolutely vested in the United States, By the second section of the act, proof of the applicant’s title to the lands injured was required to be made to the recorder of land-titles for the Territory of Missouri, who thereupon was to 'issue a certificate of the party’s right. A location being selected, and the certificate being presented to the principal deputy surveyor of the Territory, it became his duty to cause a survey thereof to be made, and to return a plat of the location made to the recorder, together with a notice in writing designating the tract thus located, and the name of the claimant on whose behalf it was made, which notice and plat the recorder was required to have recorded in his office. By the third section it was made the duty of the recorder to transmit a report of the claims allowed and locations made under the act to the Commissioner of the General Land-Office, and to deliver to the party a certificate stating the circumstances of the case, and that he was entitled to a patent for the tract designated. This certificate being presented to the land-office, a patent was issued for the land.
These are the substantial provisions of the act. As apparent on its face, it required the following steps to be taken :
1. Application to the recorder of land-titles, showing the party’s claim and praying a certificate of location.
2. Certificate of location issued by the recorder, showing the amount of land to which the applicant was entitled.
3. Application to the surveyor, presenting the certificate of location, and designating the lands which the party desired to appropriate.
4. Survey and plat made by the surveyor.
5. Beturn of the survey and plat to the recorder of land-titles, to be filed and recorded, with a notice designating the tract located and the name of the claimant.
6. Certificate of the recorder, stating the facts, and that the party was entitled to a patent.
7. Transmission of this certificate to the General Land-Office.
8. The patent.
In addition to these requisites, the land thus appropriated must be located on the public lands of the Territory the sale of which was authorized by law. *315 It is sb own by the claimant that Francis Langlois was the owner of a tract of two hundred arpents of land (about one hundred and seventy acres) in the county of New Madrid, which was materially injured by the earthquakes. It is also satisfactorily shown that application was made on his behalf on the 26th of November, 1818, to the recorder of land-titles at Saint Louis, for a certificate of location of a like quantity of lands; and that the said recorder did, on that day, grant and issue to him a certificate accordingly, (being certificate No. 467,) stating that Langlois or his legal representatives were entitled to locate two hundred arpents of land on any of the public lands of the Territory of Missouri, the sale of which was authorized by law. It also seems that Langlois at the same time, by his attorney, executed a release to the United States of his said lands in New Madrid. As this, however, was not necessary, inasmuch as the New Madrid land would revert to the United States on the completion of the substituted title to other lands of like amount, under the act, it could have no effect on the validity of Lau-glois’s title to the lands which he sought in exchange therefor. The certificate of location thus procured from the recorder was subsequently assigned to other parties, and came to the hands of Samuel Hammond and Elias Eector, under whom the -present claimant deraigus title. In January, 1819, Hammond and Eector made formal application to the surveyor-general (the officer who succeeded the principal deputy surveyor) for the entry of two hundred arpents of land to satisfy certificate No. 467, to be surveyed in a square tract with line corresponding to the cardinal points of the compass, so as to include the said Hot Springs, as near the center of the square as circumstances would admit. This application was in writing and was filed in the office of the surveyor-general, who directed James S. Conway, a deputy surveyor, to make the survey. Thereupon Conway made the survey as requested, and on the 16th of July, 1S20, made out a plat and descriptive statement of the same, which he numbered “survey No. 2903, certificate 467.” This survey was deposited by the deputy in the office of the surveyor-general at Saint Louis; but it was not recognized or recorded by the surveyor-general, nor was it returned to the recorder of land-titles. Of course no patent was obtained upon it.
Subseqently, in 1838, when the public surveys were extended to that region, the then surveyor-general, in his instructions to *316 the deputy surveyor who prosecuted the work, whether on Bee-tor’s application does not clearly apppear, directed him to survey for Francis Langlois or his legal representatives a tract of two hundred arpents, having the main spring in the center, according to the location of New Madrid certificate No. 467, which would be furnished to him. The survey was made and returned accordingly, and duly returned to the office of the recorder of land-titles, who issued a patent-certificate thereon. No patent, however, was ever issued on this location, as it was made subsequent to the act of April 20, 1832, reserving the Hot Springs and surrounding lands to the United States. This act clearly rendered void all subsequent appropriations of land unless it was repealed by the act of 1843, before referred to. The first section of that act declared that the locations of warrants issued under the act of February 17, 1815, (relating to sufferers at New Madrid,) on the south side of the Arkansas Biver, if madein pursuance of the provisions of that act in other respects, should be perfected into grants in like manner as if the Indian title to the lands on the south side of said river had been completely extinguished at the time of the passage of said act.
Attorney-General Cushing, in an opinion on this title, given in 1854, pertinently remarks- that the only obstacle removed from the New Madrid locations by this act was that of the existence of the Indian title at the time of the passage of the act of 1815. No such title existed when the survey was subsequently made; and if that were the only objection to the title in question, it would be entitled to recognition. But there stands the act of 1832, reserving the lands to the United States. Unless, therefore, the title of Sector, or those whose estate he represents, became fixed and vested, as against the Government, before the passage of that act, so as to make the act obnoxious to the objection of taking private property without just compensation, it cannot be maintained. Hence, it is all-important to ascertain the effect of the survey made for Hammond and Sector in 1820.
As before observed, that' survey was not recognized nor recorded in the surveyor-general’s office, nor returned to nor recorded in the office of the recorder of land-titles. It is proper to consider the reasons why this was not .done.
The difficulty was this: The act for the relief of the suffer *317 ers of New Madrid required that the lauds to be given to them in exchange for their injured lands should be located on public lands of the Territory “ the sale of which was authorized, by law.n Mr. Wirt, the then Attorney-General, gave it as his opinion that no lands were authorized by law to be sold which had not been publicly surveyed according to the general system of sections and townships j and as the region in which the Hot Springs were located was subject to the Indian title until 1818, and had never been publicly surveyed, no lands could be located there under a New Madrid claim in 1820, when the attempt was made by Hammond and Rector as above stated. This opinion of the Attorney-General was followed by the General Land-Office, and patents were refused for any lauds thus attempted to be located. Hence the surveyor-general did not recoguize the survey of Conway, and never returned it to the recorder. (Vide Wirt’s Opinions, 1 Opin., 361, 372.)
But on the 26th of April, 1822, Congress passed an act, entitled “An act to perfect certain locations and sales of public lands in Missouri,” by which it was enacted that the locations theretofore made of warrants issued under the act of February 15, 1815, (the act for the relief of the New Madrid sufferers,) if made in pursuance of the provisions of that act in other respects, should be perfected into grants in like manner as if they had conformed to the sectional or quarter sectional lines of the public surveys; and the sales .of fractions of the public lands theretofore created by such locations should be as valid and binding on the United States as if such fractions had been made by rivers or other natural obstructions; and the second section of the act declared that thereafter the holders and locators of such warrants should be bound, in locating them, to conform to the sectional and quarter sectional lines of the public surveys, and that all such warrants should be located within one year after the passage of the act.
In delivering the opinion of this court in Barry v. Gamble, (3 How., 52,) where the construction and effect of this act were brought under review, Mr. Justice Catron considered that the act only had reference to lands which had not been surveyed when the imperfect locations were made, and had been surveyed prior to the passage of the act; for in making provision for the fractions created by such irregular surveys, reference is only made to fractious “heretofore created.” If this view of the act *318 is correct, it decides the case, for the public surveys were not extended to these lands until long after 1822, namely, 1838. As this was not the point involved in that case, however, it is proper to look further in reference to the effect of the Hammond and Eector survey of 1820.
The petitioner’s counsel insist that the act of 1822 removed the objection that the location did not conform to the public surveys, without reference to the time when those surveys were or might be made, whether before or after the date of the act.
Conceding, for the sake of the argument, that this may be the true construction of the act, what is it that the act saves ? It is “ locations.” “ The location heretofore made of warrants issued under the act, &c., if made in pursuance of the provisions of that act in other respects, shall be perfected into grants, ”&c. By the second section locations thereafter to be made were to conform to the sectional and quarte.r-sectional lines. It becomes important, therefore, to know what is meant by a -location in the act of 1815. It evidently meant a completed location. When the land became located the title of the applicant to his Hew Madrid lauds at once reverted to the Government. The words of the act are: uIn every case where such location shall he made according to the provisions of this act, the title of the person or persons to the land injured as aforesaid shall revert to and become absolutely vested in the United States.” Now, when did this take place? Certainly not on the mere application to the surveyor-general to survey the tract which the party desired to appropriate; nor when the surveyor had planted his last stake or heap of stones on the ground; nor when he had returned home with his notes in his pocket; nor when he had made out his survey and plat. This survey and plat did not belong, the instant they were finished, to the applicant; neither did the land until something more was done. What was that something more ? The act tells us that thesurveyor must return the survey and plat, and the notice as to the party for whom the survey was made, to the office of the recorder of land-titles, to be by him filed and recorded. Then, and not till then, the applicant was entitled to a patent. Then the land first became appropriated. It then first appeared on the records of the country as his. This point has been repeatedly adjudged by this court, and has become part of the established land-law of the country, and we should do a great wrong at this late day to *319 shake it. (Bagnell v. Broderick, 13 Pet., 436; Stoddard v. Chambers, 2 How., 284; Barry v. Gamble, 3 How., 32; Lessieur v. Price, 12 How., 60; Hale v. Gaines, 22 How., 144; Rector v. Ashley, 6 Wall., 142; Mackay v. Easton, (19 Wall., 633.) th one of the latest cases on the subject, Maekay v. Easton, (19 Wall., 633,) the court, Mr. Justice Field delivering the opinion, says as follows:
“The act of Congress * * * declared that when a location was made under its provisions, the title of the person to the land injured should vest in the United States. It contemplated that there should be a concurrent investiture of title; that the title of the owners of the land injured in Hew Madrid Oqunty should pass to the United States, and that at the same time the title to the land located in lieu thereof should pass to the claimant, or rather the right of the title, for the strict legal title did not pass until the patent issued; and that this exchange of titles should take place when the claimant obtained his patent-certificate, or the right to such certificate, and that he could not acquire until the plat of the survey was returned to the recorder of land-titles. Until the plat was placed in the public depository in the Territory, of evidences of title issuing from the United States, there was no official recognition of the proceedings taken by the claimant which bound the Government.”
A brief reference to the history of land-titles in the Louisiana country will show the ground and reason for the importance attached to a return of the survey to the office of the recorder of land-titles. It is well known that the territory purchased of the French government in 1803 was in the following session of Congress divided into two Territories: one, called the Territory of Orleans, cothprising West Florida and the present State of Louisiana; and the other, called the District of Louisiana, and comprising the whole region west of the Mississippi and north of that State. (Act March 26, 1804, 2 Stat. L., 283.) The treaty by which this territory was acquired guaranteed on the part of the United States to the inhabitants the free enjoyment of their liberty, property, and religion. The land titles which had been perfected and located by surveys offered no difficulties; but there were many inchoate titles which had never been perfected, which by the laws of France and Spain the claimants had a right to perfect. In order that the Gov- *320 eminent of the United States might know what claims it was bound, in good faith, to respect, measures were taken to have all outstanding claims brought in and recorded, and located by surveys where these should be necessary. By the Act March 2, 1805, (2 Stat. L., 324,) the -Territory of Orleans was divided into two land-districts, for each of which a register was appointed ; but for the District of Louisiana an officer was created, called the recorder of land-titles, who continued for many years to exercise important functions in regard to the public lands in the district, even after the appointment of a surveyor and of registers and receivers under the general land-laws. The act referred to required every person claiming lands, whether by complete or incomplete title, within a limited time to deliver to the registers of Orleans, or to .the recorder of land-titles of the District of Louisiana, a notice of bis claim, with a plat of the tract claimed, and also his grant, order of survey, or other written evidence of his claim; which documents the said registers and recorder respectively were to record in proper books. Claims not so presented and recorded within the proper time were to be barred as against grants from the United States. The act further provided for the appointment of two additional persons in each district to act with the register or recorder as a board of commissioners to examine and decide upon the claims which should be presented; whose duty it was, after deciding, to report their decisions to Congress, and to deposit the same with all the evidence and documents in the offices of the register and recorder respectively within whose district the lands lay. At a later period the additional commissioners were dispensed with, and the powers of the board were vested in the register and recorder respectively. The reports of these commissioners, and the acts of Congress confirmatory thereof, formed the basis of the titles derived from the French and Spanish authorities. And this constitution of the office and duty of the recorder of land-titles in the District of Louisiana led to the importance subsequently attached to the return and registration of other surveys in the same office. It was there that the officers of the Government looked, or were supposed to look, for all authentic claims to land in the district. No lands were supposed to be appropriated or segregated from the public domain unless recorded or registered there.
*321 Now, tbe difficulty in this case is that the survey of 1820 was never returned to the recorder’s office, and, therefore, this land never became located, within the meaning of the act of 1815 or the act of 1822. It never became segregated from the public domain. It never became so appropriated to the claimants as to give them a vested right and prevent the operation of the act of April 20,1832, by which it was reserved to the United States.
But the claimant insists that this was not the fault of Hammond and Bector; that they did all they could do; and that the surveyor-general could not, by neglecting his duty, namely, that of recording the survey and returning it to the recorder of laud-titles, deprive them of their just rights. But, when the survey was made, the act of 1822 was not in existence; the laws then were, as the Attorney-General held them to be, that un-surveyed lands were not lands the sale of which were authorized by law; and as this doctrine was received and acted upon by the land department of the Government, we should not feel authorized at this late day to reverse it. And it is not shown that any further efforts were made to have the location perfected until after the passage of the act of 1832. If at any subsequent time it became the duty of the surveyor-general to return the survey to the recorder’s office, no application for that purpose seems to have been made. A clear duty on his part could have been enforced by mandamus had he refused to perform it. But it is unnecessary to speculate. Nothing further was done, and no vested right accrued under the claim.
In conclusion, we feel bound to decide that none of the claimants are entitled to the lands in question. . The claims advanced all depend on one or other of the titles which we have considered, and all are equally untenable. Whatever hardship, if any, may ensue from this declaration of the law of the case we have no doubt will be duly taken into consideration by the legislative department of the Government in dealing with the subject of the future disposition of those lands.
It is just to say that we have been much aided in the investigation of this case by the able arguments of the counsel on both sides, and by the elaborate opinion of the Court of Claims, which supersedes the necessity of our going more into detail in the discussion of the various questions involved.
The decree of the Court of Claims is affirmed.