GOODE *v.* GAINES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

No. 227. Argued April 18, 1892. — Decided May 2, 1892.[1]

The court again adheres to its decision in *Rector* v. *Gibbon*, 111 U. S. 276, touching titles in the Hot Springs Reservation, and holds that there are no facts in these cases which take them out of the operation of that decision; but, in view of the delay in commencing these suits, and the previous acquiescence of the plaintiffs in the possession by the defendants, it limits the right of an account in equity of the rents of the premises to the date of the filing of the bills.

---

[1] With this case were argued at the same time No. 302, SMITH *v.* GAINES; No. 303, DUGAN *v.* GAINES; No. 304, COHN *v.* GAINES; No. 305, ALLEN *v.* GAINES; No. 306, MADISON *v.* GAINES; No. 307, RUGG *v.* GAINES; No. 308,

THE court stated the case as follows:

These were bills in equity filed by William H. Gaines and wife, on the 23d of May, 1884, against the appellants, respectively, in the Circuit Court of the United States for the Eastern District of Arkansas, all seeking the same relief, and couched, *mutatis mutandis*, in substantially the same language.

The bill in No. 302, *Smith* v. *Gaines*, was as follows:

"William H. Gaines and Maria Gaines his wife, bring this suit against John Kubler and George H. Smith, and for cause of action allege that in the year 1851, in pursuance of the instruction of the Secretary of the Interior, plaintiff Maria Gaines, Albert Belding, Henry Belding and George Belding, heirs and legal representatives of Ludovicus Belding, entered, under the preëmption laws of the United States, the southwest quarter of section thirty-three, in township two (2) south, range nineteen (19) west, for which they paid the United States government two hundred dollars, which was advanced by plaintiff Wm. H. Gaines, and which money the United States still retains. At the time of said entry a small portion of said land was occupied by Mrs. Lydia Belding, widow of Ludovicus Belding, and the portion of said land for which this suit is brought was occupied by —— ——, and in — Wm. H. Gaines, Maria Gaines, Albert Belding, Henry Belding, and George Belding, under the supervision and control of Wm. H. Gaines, brought suit in the Hot Springs Circuit Court against —— —— and recovered judgment for the possession of said land, which judgment was afterwards affirmed by the Supreme Court of the State of Arkansas and by the Supreme Court of the United States, and on the — day of ——, 1856, Wm. H. Gaines was, by the sheriff of Hot Springs County, put into the possession of said property by virtue of a writ of possession issued upon the judgment of said Hot Springs Circuit Court in

GARNETT *v.* GAINES; No. 309, GARNETT *v.* GAINES; No. 310, RUGG *v.* GAINES; No. 311, GRANGER *v.* GAINES; No. 312, NEUBERT *v.* GAINES; No. 313, SUMPTER *v.* GAINES; No. 314, LATTA *v.* GAINES; No. 315, LATTA *v.* GAINES; all Appeals from the Circuit Court of the United States for the Eastern District of Arkansas. The opinion of the court is entitled in all the cases.

obedience to the mandates of said Supreme Courts, both of the State and of the United States, and said plaintiffs, Wm. H. Gaines and Maria Gaines, his wife, remained in peaceable and quiet possession of said property until the 1st day of June, 1876, when they were dispossessed of said property by a receiver appointed by the Court of Claims of the United States, under an act of Congress entitled "An act in relation to the Hot Springs reservation, in Arkansas, approved June 11th, 1870.

"Plaintiffs entered into possession by virtue of said entry and by virtue of the decisions of said State and United States Supreme Courts and the writs of possession issued in pursuance of said judgments, and continued in possession for a period of about twenty years, until the Supreme Court of the United States, in a suit to determine to whom the patent should issue, decided that said lands were not subject to preemption or entry, and that no claimant was entitled to a patent, but the same was still the property of the United States, which decision was rendered April 24th, 1876. Plaintiff during said twenty years paid taxes on said property and fenced and built houses on the same and otherwise improved the same.

"On the 1st day of October, 1870, plaintiff Wm. H. Gaines leased a lot of ground, which has since been laid off into lots and blocks by the Hot Springs Commission in pursuance of an act of Congress and is now known as lot (2) two, in block seventy-seven (77), to John Kubler, which lease was for the term of one year, to be renewed at the election of the lessee from year to year until the title to the Hot Springs quarter section of land was settled, for an annual rent of ——, payable in monthly instalments of ——.

"Said lease also provides that all buildings and improvements erected on said lot by the lessee might be removed therefrom during the continuance of the lease or within thirty days thereafter, but that no buildings or improvements erected could be removed while said rent or any part thereof remained due and unpaid. It also provides that the lessor should have a lien on all buildings and improvements to secure the rent, a

copy of which is hereto attached in Exhibit 'A' and made a part thereof.

"Said lessee took possession of said land under and by virtue of said lease only, and in no other way whatever, and he and — assigns occupied the same under said lease until the 1st day of June, 1876.

"That on the 24th day of April, —, said lessee and his assigns owed the lessor for rent the sum of three hundred and eleven dollars and eighty-five cents ($311.85). Said lessee and his assigns failed to remove said buildings and improvements erected by them at any time during or within thirty days after the expiration of the lease, and by virtue of the provisions of the lease said buildings and improvements erected by said lessee and his assigns became the buildings and improvements of Wm. H. Gaines.

"That on the 12th day of September, 1876, said lessee, John Kubler, sold and transferred to George H. Smith all his right, title, and claim to said premises, he, George H. Smith, well knowing before said transfer all the terms and conditions of said lease, which transfer was made without the knowledge or consent of the plaintiff.

"Plaintiffs, by arrangement with George, Henry and Albert Belding, having become the owners of said claim, aver that in less than six calendar months after the first sitting of the Hot Springs Commission, under the act of Congress of the United States entitled 'An act in relation to the Hot Springs reservation, in the State of Arkansas,' approved March 3rd, 1877, they filed their claim before said commission to purchase said lot, and that George H. Smith filed a like claim, and upon the hearing of said claims they were consolidated by said commission for the purpose of hearing the testimony; and said petitions filed and the testimony taken before said commission clearly showed that George H. Smith had acquired his possession in no other way but by said lease made by plaintiff Wm. H. Gaines to said John Kubler, as will more fully appear from a complete copy of the petition, testimony and record entries in said claim, filed herewith and marked Exhibit 'A,' and made part hereof; and notwithstanding that said peti-

tion and testimony showed that defendant George H. Smith acquired possession only by virtue of said lease, and that, too, after the 24th day of April, 1876, to wit, September 12th, 1876, still said commission misconstrued the law applicable to that state of facts and awarded the right to purchase said lot to defendant George H. Smith, and since said award said defendant has purchased said lot from the United States and received a patent therefor, and on account of said misconstruction of the law as applied to the facts before said commission the right to purchase said lot, which in law, equity and good conscience should have been awarded to plaintiffs, was by said misconstruction of the law illegally and wrongfully awarded to defendant George H. Smith by said Hot Springs Commission.

"Plaintiffs aver that as defendants have never had any right or title to said lot or to the possession thereof than that which they derived from said lease and under covenants to restore possession to plaintiff Wm. H. Gaines, that said defendants should be held to hold said lots as trustees for the use and benefit of plaintiffs.

"Plaintiffs offer to pay any sum of money that may be found due to the defendants or either of them by reason of any money paid to the United States for the purchase of said lots, and to do all other acts which may be found to be just and equitable. Plaintiffs aver the property herein sued for is worth more than five hundred dollars, and that this cause of action arises wholly under the law of the United States.

"Plaintiffs ask that defendants be required to answer this bill, but not under oath.

"And they pray that an account may be taken of the state of accounts between themselves or either of them and said defendants severally; that they may be allowed reasonable rents for the occupancy of the said premises; that defendants may be decreed to hold said lots as trustees for the plaintiffs and to convey the same to the plaintiffs, and that they may have such other relief as may be equitable."

Answers and replications having been filed, proofs were made sustaining complainants' allegations, and the Circuit

Court entered decrees in complainants' favor as to the title to the lots severally involved, and sent the cases to a special master for an accounting. Reports were subsequently made, stating an account charging defendants with rent or rental value from the date of the awards to the date of the filing of the bills with interest, and with rental value from the date of filing the bills to the date of the decree with interest, and with rent on improvements to the date of the reports; and crediting defendants with the present value of the improvements; taxes, etc., paid; and the amount paid the government for the lots, with interest. Decrees were entered in accordance with the reports and the cases brought on appeal to this court.

*Mr. John McClure* for appellants in Nos. 302 to 315 inclusive.

The matters in controversy in these cases grow out of, and are founded on the act of March 3, 1877, which provides for the survey and sale of what is known as the Hot Springs reservation, in the State of Arkansas, 19 Stat. 377, c. 108, and the act of June 16, 1880, entitled, "An act for the establishment of titles in Hot Springs, and for other purposes." 21 Stat. 288, c. 246. The question of those titles was before this court in *The Hot Springs Cases*, 92 U. S. 698; *Rector* v. *Gibbon*, 111 U. S. 276; and *Lawrence* v. *Rector*, 137 U. S. 179. I contend *Rector* v. *Gibbon* does not furnish a rule of decision for these cases.

At the threshold, I am willing to admit, if the court had the power to decide anything in the Rector-Gibbon case at all, it is decided correctly. While I admit the case was decided correctly, I do not assent to the proposition that this or any other court could divest title out of one in whose favor the award was made, and vest it in another, even if the decision of the commission was wrong. That case turned on the construction of a lease, and it no more follows that one lease is to be construed like another, than that one contract means what another does.

The lease in the Rector-Gibbon case stipulates that at the

end of the term the lessor should have the right to take the improvements by paying two-thirds of their first cost; that if the lessor should not pay this amount at the end of the term, the lease should be extended on the same conditions, until he should make the payments, giving ninety days' notice of his intention to terminate the lease.

The proof was, that Rector gave the notice, that he was ready and willing to pay, but he could never get the lessees to give or name the amount.

The leases, in the cases at bar, declare that they may " be renewed, from year to year, until the title to the Hot Springs quarter section is settled, . . . and that all buildings and improvements that may be erected on said lots by the lessees, may be removed therefrom by the lessees, at any time within thirty days after the expiration of the same."

In the Rector-Gibbon case, the improvement became the property of the lessor by the election and the terms of the contract. In the cases at bar, the buildings were to remain the property of the lessees without any stipulation for purchase by the lessor.

In the Rector-Gibbon case, the court found that Rector was the owner of the improvement and gave him the lot. In the cases at bar, the court finds, as did the commission, that the buildings belong, not to the lessor, but to the lessees. In one case, the right to purchase the lot falls to him who was the rightful owner of the improvement, and in the cases at bar, the person who is found to be the owner of the improvement is declared to be a trustee for one who did not make or own the improvement.

In the one case the lease created a contract whereby the lessee undertook to build a house for the lessor, while in the case now under consideration the contract was that the lessee might build a house for himself.

The questions discussed in the Rector-Gibbon case were as to the nature of the grant contained in the act of 1877; to whom it was made, and whether the decisions of the commissioners were final.

Four of the judges of this court were of the opinion tha

the award of the commissioners was final, expressing no opinion as to the nature of the grant, and five were of the opinion that it was not, and that, for errors of law, its decisions might be reviewed.

Congress, during the pendency of the bill, now known as the act of 1877, refused to allow an amendment to be made to the bill, granting the courts jurisdiction to review the awards of the commissioners; and after the awards were made, it was again appealed to, to allow the courts to review the awards, and it again refused. Congress was asked to amend the act of 1877, during its pendency, to make it mean what the court, in *Rector* v. *Gibbon* said it meant, and it refused to allow the words the court placed in the act of 1877 to become a part of it, because it changed the grant from the persons on whom they intended to bestow the bounty, and conferred it on persons who had asserted title, instead of those who had made improvements.

I am not influenced to indulge in this line of argument, from the fact that the personel of the court has changed since the decision in the Rector-Gibbon case, for I shall not indulge in argument that I would not have indulged in, if the personel of the court had remained the same.

I am not here to make a wanton attack on the Rector-Gibbon case, nor to disturb matters set at rest by that decision, but to protect the interests of clients, by calling, in a respectful manner, the attention of the court to some matters that were not called to its attention before, with a feeling of confidence, if they had been, the decision might have been different.

The fact that neither Rector nor Gibbon could acquire title under the act of 1877, and that no claimant at Hot Springs acquired title under the act of 1877, does not seem to have been called to the attention of the court.

The fact that Congress, by the act entitled, " An act for the establishment of titles in Hot Springs, and for other purposes," approved June 16, 1880, by direct enactment, authorized these appellants to purchase the lots in controversy, seems to have been overlooked in the Rector-Gibbon case. The first section of the act to which I allude is as follows:

"That any person, his heirs or legal representatives, in whose favor the commissioners appointed under the acts of Congress of 1877 and 1878, relative to the Hot Springs of Arkansas, have adjudicated, shall have the sole right to enter and pay for the amount of land the commissioners may have adjudged him entitled to purchase, within eighteen months next after the expiration of the notice required . . . at 40 per centum of the assessed value of said lands as placed thereon by said commissioners."

All titles at Hot Springs are based on the act of June 16, 1880, and not on the act of 1877. The difference between these acts is, that under the act of 1880, the right to purchase the lot comes by a declaration of Congress, and that the persons in whose favor the commissioners have adjudicated shall have the sole right to purchase, while under the other the right to purchase comes from the award of the commissioners.

It is true that the commissioners have adjudicated that certain persons should have the right to purchase the lots in controversy, but it is also true that, after that adjudication, Congress took the whole question of awards under consideration, and by a direct and express enactment declared the appellants should have the sole right to purchase. The question now is, not whether the court can review the awards of the commissioners, but whether it can review and set aside the award of Congress.

If the language of the opinion in the Rector-Gibbon case be read in the light of the facts disclosed by the record, it furnishes no rule of decision for the cases now before the court. But if you take an isolated sentence like this: "Whatever the lessees and those under them did, by way of improvements on the leased premises, inured to the lessor's benefit as absolutely and effectually as though done by himself," and apply it to a case where the improvements, under the lease, were to remain the property of the lessees, you establish a rule of decision that violates the obligation of the contract and takes the property of one man away from him and gives it to another. You turn the act of 1877 into an act of confiscation, instead of that of preëmption.

If the leases, in the cases now under consideration, had a similar provision to that exhibited in the Rector-Gibbon case, there are many expressions of opinion to be found that would apply to the cases at bar, but there is no such lease. I have a right to assume, and shall assume, that the court intended its language to be confined to the case made by the record, and was not attempting to fix a rule of decision in cases not before the court.

It is said in the opinion that, " lessees under a claimant or occupant holding the property for him and bound by their stipulation to surrender it on the termination of their lease, stand in no position to claim an adverse and paramount right to purchase. Their possession is his possession." If this sentence be taken as an interpretation of the act, without reference to the facts disclosed by the record, in which the language was used, the appellees could draw some comfort from it; but confine it to a case where the lease gave the improvements to the lessor, and where the right to purchase the lot followed the ownership of the improvements, it furnishes no rule of decision in a case where one claims the lot and where it is adjudged the improvements do not belong to him.

When the court makes use of the expression, " holding the property for him," the word property is used in its broad sense, covering the improvements as well as the lot. It is not used in its narrower sense and confined to the lot itself.

After the 24th of April, 1876, there was no such thing as holding the property for the old claimant, unless the old claimant was the legal or equitable owner of the improvements on the lot. The relation of landlord and tenant was on that day dissolved by the terms of the contract. The title to the property on that day was in the United States, and it soon thereafter took possession by its receiver; and to say that the old tenants of Gaines " held possession for him," while they were attorning to and paying rent to the United States, is to extend the relation of landlord and tenant beyond the confines of known law. Nor is it true, as a proposition of law, that a former tenant could not acquire title from the new landlord.

Before the 24th of April, 1876, there were two estates; the fee and the leasehold. On that day the fee was declared to be in the United States. On the leasehold were improvements which the lessees, under their lease, had the right to remove, but being fixtures they could not be removed without the assent of the new landlord. If the buildings on the lots had belonged to the lessor, and the old tenant remained in them, I concede that after the passage of the act of 1877, the commissioners should have treated the occupant in the light of one holding over. Not because the relation of landlord and tenant existed during that period, but because the right to purchase the lots was awarded to the former owner of the improvement. The right to the lot, as well as the improvement, had been lost. Congress granted the improvement to the former owner, regardless of past relations.

In the case where the improvement belonged to the lessor, it conferred on him the right to purchase the ground on which the improvement had been made. But if the improvement belonged to another than the lessor, the right to purchase went to him who owned it on the 24th of April, 1876. The right to purchase flows from and is bottomed on an improvement. No improvement, no lot.

The contention of the appellee is, that the possession which the appellant had, of his own house, was the possession of the appellees; that that possession was under a lease from him, and that whatever a donor should elect to present, of right, must go to the landlord. The bald, naked claim is, that, having accepted a lease the term of which expired, the new landlord could not make a present to his old tenant, or give him a right to purchase the land.

The appellee could not avail himself of an improvement made by another unless he was the owner of it.

To give the lots in controversy to Gaines is to give them to one who, the court finds, as a matter of fact, never made any improvement thereon. To give them to Gaines under such a finding, is to disregard the letter and spirit of the statute. To give them to Gaines, is to take from appellants that which the Congress of the United States, by a solemn act, declared

they should have. To give them to Gaines, is to say that the courts and not Congress have the sole right to dispose of the public domain.

It is apparent, from the language of the act of 1877, that Congress intended that the adjudications of the commissioners should be final, and that this intent is made manifest from following the form of statutes that this court, for more than a quarter of a century, had declared created a board belonging to the political department of the government, and whose adjudications could not be reviewed by the courts.

*Mr. Thomas B. Martin* and *Mr. George W. Murphy* filed a brief for the appellant in No. 227, claiming that that case differed from the others in some essential features.

*Mr. U. M. Rose* (with whom was *Mr. G. B. Rose* and *Mr. R. M. Davies* on the brief) for appellees.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

It is unnecessary to enter upon a history of the "Hot Springs litigation," as detailed in *Rector* v. *United States; Hale* v. *United States; Gaines* v. *United States,* 92 U. S. 698; and *Rector* v. *Gibbon,* 111 U. S. 276.

As to the title of the lots in question, we repeat what was said in *Lawrence* v. *Rector,* 137 U. S. 139, "that nothing was developed in answer or testimony to disturb the conclusions of law heretofore reached by this court." The argument for appellants has been elaborate and exhaustive, but does not convince us that these cases can be taken out of the rule laid down in *Rector* v. *Gibbon.*

The estoppel which prevents a tenant who has acquired possession as such from claiming title adversely to his landlord, does not depend on the validity of his landlord's title. And the assertion in the bills that the right to remove the buildings put upon the lots by the tenants was abandoned, and the fact that, while appellees made improvements upon

the land claimed by them, they were not shown to have made such on the specific lots, do not affect the operation of the estoppel. Belding's heirs claimed under a paper title, and if there had been no tenants, the improvements made by themselves would have given them the "possessory right of occupation" of the tract within the meaning of the act of Congress; and the tenants cannot be allowed to object that the improvements which they made, and which, strictly speaking, they abandoned by their conduct in the premises, gave them rights superior to their landlord.

The decision of this court in 92 U. S. 698 was rendered April 24, 1876, and the receiver was appointed and took possession of the property for the United States in June of that year. The act of March 3, 1877, "in relation to the Hot Springs reservation in the State of Arkansas," (19 Stat. 377,) creating the commission, provided that "no claim shall be considered which has accrued since the twenty-fourth day of April, eighteen hundred and seventy-six," and referred to claims to the land, or parts thereof, then existing, and not to independent claims acquired thereafter. But there is no merit in the suggestion that George, Henry, and Albert Belding could not lawfully assign their interest in the Belding claim to Gaines after that date, for the language of the act relates to claims that had then accrued, and not to the subsequent acquisition of claims so situated. It may be that after the title was adjudged to be in the United States the tenants could not remove the buildings; but the commissioners found that the buildings belonged to them, and the decrees here gave the value of them to appellants. No appeal was prayed by appellees in this regard and no question arises in respect of it. Inasmuch as the tenants set up claims to the lots in hostility to the leases, they cannot complain of decrees in their favor for the value, and whether under some of the leases the buildings were to become the property of the lessor, while in other cases they might have remained the property of the lessees, does not control the principle upon which *Rector* v. *Gibbon* rests. As to the contention that the act of Congress of June 16, 1880, (21 Stat. 288,) was not given due weight because not

referred to in the opinion in *Rector* v. *Gibbon*, it is to be observed that that suit was brought July 12, 1880, argued here March 19, 1884, and decided April 7, 1884. It is not, therefore, to be assumed that the act of 1880 was overlooked at that time, but that the court was of opinion that it did not affect the questions under consideration; and in that view we concur.

We are not satisfied, however, with the directions to the master in the interlocutory decrees, in respect of the accounting, and with the results thereupon finally adjudged. While, by reason of the original leases, appellants must be decreed to hold the several parcels in controversy in trust for appellees, and to surrender possession thereof, yet it is to be borne in mind that they were not knavish or fraudulent possessors, and that they claimed title, in moral good faith, under the awards of the commission. The evidence disclosed that a large number of lots were awarded to appellees; that Gaines expressed himself as contented with the awards, stating that they were just and equitable; and that no steps in further litigation were taken, on appellees' behalf, until after the announcement of the decision of this court in *Rector* v. *Gibbon*, which was on April 7, 1884, when (in May following) these bills were filed. In the meantime appellants had paid the government, and obtained patents, under the awards in their favor, and had remained in possession upon the belief that their title was good, seeking no other location, making no other arrangements, and acting in expenditure as if these lots were their own. While this acquiescence on appellees' part has not taken away their right of action to recover the property, we think it operates upon the right to equitable relief, in the matter of permitting a recovery, by way of accounting, which they have themselves applied for to a court of equity, for the period of time from the date of the awards to the date of the filing of these bills. Appellees permitted appellants to go on in the exercise of ownership over the property, not only unmolested and without question, but with affirmative encouragement to them to do so, and, under the peculiar circumstances which characterize these cases, we do not feel compelled to award a measure of relief,

which, in our judgment, would operate harshly and oppres- sively upon appellants, even though specific prejudice, because of appellees' laches, may not be clearly made out upon these records.

In seeking equity, appellees must do equity, and as a result has been reached which gives the awards of the commission a direction contrary to that which appellees had accepted as substantially equitable, we think equity requires that they should not be treated as occupying the same position as if they had maintained with vigor and promptness the rights which they found on April 7, 1884, they could assert.

In No. 227, *Goode v. Gaines,* considerable stress is laid by counsel upon evidence which it is urged makes out an estoppel against appellees as to the title, but we agree with the Circuit Court that it falls short of doing so, and this case must be disposed of in the same way as the others.

We are of opinion that the accounting between the parties should be stated both as to debit and credit from the 23d of May, 1884, with the exception of the credit for the amounts paid to the government for the lots, of which payments we regard appellees as getting the entire benefit, and that no increased rent should be allowed on account of the improvements, as appellees are only to be held to their value as of the date of the decrees. In other words, appellants should be charged with rental value from the date of the filing of the bills to the rendition of the decrees, with interest, and should be credited with taxes, etc., paid after the date of the filing of the bills, with interest, and also with the amounts paid the government for the different parcels, with interest from the dates of payment, as well as with the value of the improvements, in each instance, at the time of the rendition of the decrees.

*The decrees are severally reversed, and the causes remanded to the Circuit Court, with a direction for further proceedings in conformity with this opinion, the costs in this court to be equally divided.*