## RECTOR *v.* GIBBON & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

Argued March 19th, 1884.—Decided April 7th, 1884.

*Hot Springs Reservation—Public Lands—Estoppel.*

The powers conferred upon the commissioners appointed under the " Act in relation to the Hot Springs Reservation in the State of Arkansas " passed March 3d, 1877, 19 Stat. 377, were analogous to those conferred upon the Receiver and Register of the Land Office in cases of conflicting claims to pre-emption.

The aim of Congress in statutes relieving parties from the consequences of defects in title has been to protect *bona fide* settlers, and not intruders upon the original settlers, seeking by violence, or fraud, or breach of contract to appropriate the benefit of their labor. The legislation in this respect and the decisions of this court upon it reviewed.

The provision in § 5 of the act of March 3d, 1877, that the commissioners shall " finally determine the right of each claimant or occupant," relates to the legal title which under the act is to pass from the United States ; but it does not preclude a court of equity, after issue of a patent in accordance with the determination of the commissioners, from inquiring whether the legal title from the United States is not equitably subject to a trust in favor of other parties. *Johnson* v. *Towsley*, 13 Wall. 72, cited and followed.

After the passage of the act of June 11th, 1870, 16 Stat. 149, referring the title in the Hot Springs Reservation to the Court of Claims, but before the adjudications under it, A, who had been in possession of a tract in the reservation for nearly forty years, leased it to B, with a covenant from B to surrender at the expiration of the term. In the proceedings under that act A's title was adjudged invalid. *Hot Springs Cases*, 92 U. S. 698. Under the

act of March 3d, 1877, 19 Stat. 377, A and one claiming by assignment from B appeared before the commissioners, each claiming the right to receive the certificate for the leased tract. The commissioners adjudged it to B's assignee, and a patent issued accordingly. *Held,* That under the circumstances the assignee of B, the lessee, was estopped in equity from setting up the subsequently acquired legal title against A, the lessor.

This was a suit in equity commenced in Garland Circuit Court in Arkansas, and removed under the Removal Act to the Circuit Court of the United States for the Eastern District of Arkansas. The bill alleged that the plaintiff went into possession, in 1839, of a tract of land within the Hot Springs Reservation in Arkansas, under color of title derived from the location of a New Madrid claim, and made valuable improvements on it, and continued in possession until dispossessed in 1876 by the receiver appointed by the Court of Claims; that in 1873, a lease was made by his son, as his trustee, to Gibbon and Kirkpatrick, parties defendant, the lessees covenanting to make certain improvements thereon, which were to become the lessor's property on the expiration of the term on payment of a part of the cost, and to pay an agreed rent and to deliver up the premises on the expiration of the term; that in 1877, Gibbon and Kirkpatrick transferred the lease to one Ballantine, who died leaving his children, the other parties defendant, as heirs; that in the proceedings before the commissioners under the act of March 3d, 1877, 19 Stat. 377, the plaintiff appeared and filed a claim to purchase the tract, and the heirs of Ballantine did the same, and that the commissioners awarded the right to the heirs. There were other allegations not material in the issues decided in this case. The bill was demurred to because " plaintiff claims the property described in the complaint, on the ground that he was an occupant and owner of improvements thereon, when that question, as appears, was finally decided by the Hot Springs commissioners under the act of Congress of March 3d, 1877."

Section 5 of that act is as follows :

" Sec. 5. That it shall be the duty of said commissioners to show by metes and bounds on the map herein provided for, the parcels or tracts of lands claimed by reason of improvements made

thereon, or occupied, by each and every such claimant and occupant on said reservation ; to hear any and all proof offered by such claimants and occupants and the United States in respect to said lands and in respect to the improvements thereon; and to finally determine the right of each claimant or occupant to purchase the same, or any portion thereof, at the appraised value, which shall be fixed by said commissioners : *Provided, however,* That such claimants and occupants shall file their claims, under the provisions of this act, before said commissioners within six calendar months after the first sitting of the said board of commissioners, or their claims shall be forever barred; and no claim shall be considered which has accrued since the twenty-fourth day of April, eighteen hundred and seventy-six."

The demurrer was sustained.  The plaintiff appealed.

*Mr. A. H. Garland* (*Mr. U. M. Rose* and *Mr. F. W. Compton* were with him) for appellant.

*Mr. Sol. F. Clark* and *Mr. Samuel W. Williams* for appellees.

Mr. Justice Field delivered the opinion of the court.

This is a suit in equity, brought by the plaintiff to charge the heirs-at-law of David Ballantine, as trustees of certain real property within the Hot Springs Reservation in the State of Arkansas, and compel them to convey it to him.  The question for determination is whether under the act of Congress of March 3d, 1877, providing for the sale of part of the reservation, they were entitled to purchase the property in preference to him.

From the protracted litigation to which it has given rise, the Hot Springs Reservation is famous in the history of land titles of the country.  Early in the present century the medicinal qualities of those springs were discovered, and from that fact the adjacent lands had an exceptional value.  They were claimed by different individuals, some portions under a New Madrid certificate, and some portions under pre-emption settlements.  The plaintiff entered upon the parcels in controversy as early as 1839, under an attempted location of a New Madrid

certificate made in 1820, and he remained in their exclusive possession until April 24th, 1876. They were then taken in charge by a receiver appointed by the Court of Claims under an act passed in 1870, to enable persons claiming title, either legal or equitable, to the whole or to any part of the four sections of land constituting the reservation, to bring suit in that court for the determination of their title as against the United States. Four suits were brought, one of them by the plaintiff, and they resulted in an adjudication that the title was in the United States, and that the several claims were invalid. *Hot Springs Cases*, 92 U. S. 698. The decision against him was regarded as a special hardship, both from his long possession, and from the fact that his failure to obtain a title was occasioned by the neglect of the public officer, under whose direction the land was surveyed, to return the survey and a plat of the location to the recorder of land titles for the Territory of Missouri. Until such return the location under the New Madrid certificate was incomplete, and the lands were not appropriated so as to exclude the operation of the act of April 20th, 1832, by which the four sections were reserved for the future disposal of the United States. This court, in rejecting all the claims, observed that whatever hardship might thereby ensue would, no doubt, be taken into consideration by the legislative department in the future disposition of the lands. Accordingly, and, it is believed, upon this suggestion, Congress passed the act of March 3d, 1877. It provided for the appointment by the President, of "three discreet, competent, and disinterested persons" to constitute a board of commissioners, and imposed upon them various duties. Among other things, it required them, under the direction and subject to the approval of the Secretary of the Interior, to designate a tract sufficiently large to include all the hot or warm springs on the land, embracing what is known as the Hot Springs Mountain, which tract was declared to be reserved from sale ; and to lay out the residue of the land into convenient squares, blocks, lots, avenues, streets, and alleys, the lines of which were to correspond with existing lines of occupants of the reservation as near as might be consistent with the interests of the United States. It also

provided that they should, by a map prepared for that purpose, show the metes and bounds of the parcels or tracts claimed by reason of improvements thereon, or occupied on the reservation; should hear proofs offered by claimants and occupants in respect to the lands and improvements, and "finally determine the right of each claimant or occupant to purchase the same, or any portion thereof, at the appraised value fixed by the commissioners." It declared that claimants and occupants should file their claims before the commissioners within six months after the first session of the board, or that their claims should be barred; and that no claim should be considered which had accrued after the 24th of April, 1876. It also made it the duty of the commissioners to file in the office of the Secretary of the Interior the map and survey, with the boundary lines of each claim clearly marked thereon, and with each division and subdivision traced and numbered, accompanied by a schedule showing the name of the claimant of each lot or parcel of land with its appraised value; and also all the evidence taken by them "respecting the claimant's possessory right of occupation" to any portion of the reservation, and their findings in each case, with their appraisal of the value of each tract and of the improvements thereon; and to issue a certificate to each claimant setting forth the amount of land the holder was entitled to purchase, and its valuation, and also the character and valuation of the improvements. 19 Stat. 377.

The act made it the duty of the Secretary of the Interior, within thirty days after the commissioners had filed their report and map, to instruct the land officers of Little Rock land district to allow the lands to be entered, and to cause a patent to be issued therefor.

Within the required time, the plaintiff filed his claim before the commissioners, and presented proof showing his long continued occupation of the land in controversy, and the improvements he had made thereon. Whilst it was in his occupation, on the 21st of February, 1873, he, through his son, who held the property as trustee to pay certain debts, leased it to the defendants Gibbon and Kirkpatrick, for the purpose of a hotel, bath-house and out-houses, at an annual rent of $500, and

$1,500 additional for water privileges, for the term of three years and three months, beginning on that day and ending on the 21st of May, 1876. The lease provided that the hotel and other improvements should not cost more than $12,000; that at the end of the term the lessor should have the right to take the improvements by paying two-thirds of their first cost, and should take the furniture in the hotel and bath-house by paying its actual value, so that the same should not exceed $8,000; that, if he should not pay these amounts at the end of the term, the lease should be extended on the same conditions until he should make the payments, giving ninety days' notice of his intention to terminate the lease; that upon its termination as specified the lessees should deliver to him, or to his successors in office, or grantees, or to "whomsoever at that time in law may have the right to control the trust property," all the lands leased to them, "promptly without failure and free from let or hindrance of any kind whatever, together with all buildings, out-houses, and improvements" that might be erected on the premises. The terms "to whomsoever at that time in law may have the right to control the trust property" refer to persons lawfully controlling the property under authority derived from the plaintiff. The lessor then held the property as trustee, and by the covenant, when the trust should be discharged, the right of control would revert to him. They were not intended to authorize a delivery under any circumstances to parties claiming adversely.

Soon after the lease was executed the trust was discharged by the payment of the debts, and the property and possession reverted to the plaintiff. Before the lease he had made improvements of the value of at least $1,000 in excavations, grading, and building a wall to protect the land from the action of the water of the Hot Springs Creek, and had erected valuable buildings. After the lease a hotel was built on the premises, and before the end of the term the parties agreed that the lease should be continued until some time in the future, when it might be terminated by written notice as provided in the instrument.

In the year 1877 the lessees sold and transferred all their in-

terest in the premises to one David Ballantine, he knowing at the time the terms and conditions of the lease.    While the lessees were in possession, and before their transfer, the plaintiff gave them notice of his desire to terminate the lease, and requested them to furnish him with a list of the furniture coming within its provisions, which they promised to do, but never did. He never could get from them the information required for settlement, and therefore none was ever made, though he was ready and willing and frequently offered to pay all the sums that might be due to them under the terms of the lease, which offer they, under various pretences, always declined.    After entering upon the premises under the transfer, Ballantine died, being at the time a resident of Illinois, leaving surviving him certain of the defendants who are named in the bill of complaint as his heirs-at-law.    By the survey of the commissioners a part of the premises was laid off and designated as lots five, six, seven, eight, nine, ten and eleven in block eighty-nine in the town of Hot Springs, and the residue thereof, on which the hotel and some of the out-buildings were erected, was laid off into a street. They were appraised at the value of $10,000, and condemned, and were then torn down and destroyed.    A certificate of their condemnation and value was given to the heirs of Ballantine. As already mentioned, the plaintiff filed his claim to purchase the lots before the commissioners.    The heirs of Ballantine also filed a like claim, and to them was awarded the right to purchase, although it was shown that their ancestor had acquired his possession under the lease made to Gibbon and Kirkpatrick. For these reasons—that the heirs never had any other right or title to the lands, or to their possession except under the lease, containing covenants to restore the property and possession to the lessor or to his successor in title on its termination—the plaintiff prays that they be adjudged to hold the lands as trustees for his use and benefit, and be decreed to convey them to him, on his paying the money advanced in the purchase, and that he be allowed reasonable rent for the occupancy of the lands.

The bill of complaint sets forth the material facts which we have stated, and a demurrer to it was sustained, the court hold-

ing that the decision of the commissioners awarding to the heirs of Ballantine the right to purchase was a final adjudication and conclusive upon the parties; and even if not conclusive was correct. The ruling in both particulars the plaintiff insists was erroneous.

It is very clear that the heirs of Ballantine are not parties for whose benefit the act of 1877 was passed. He only acquired his claim to the property during that year by transfer from the original lessees of their leasehold interest. He could not assert any independent claim acquired after April 24th, 1876. The act in terms declares that no claim to purchase any portion of the reservation accruing after that date, shall be considered by the commissioners. As already mentioned, it followed our decision that certain persons, claimants and occupants of portions of the reservation, were not entitled to the land, and was designed to confer upon them and others in like position a title to such portions as they had occupied or improved, after first setting aside and reserving from sale a tract sufficiently large to include the Hot Springs and land immediately adjacent. Those parties were not trespassers, in the offensive meaning of that term, nor intentional invaders of the rights of the United States. They entered upon the land in the confident belief that they were authorized to do so. The plaintiff relied upon a New Madrid certificate which was located upon the lands in controversy as far back as 1820, and his failure to secure the title arose, as already stated, from the omission of the public surveyor to return the survey and a plat of them to the recorder of land titles before the act of 1832 took effect and withdrew the lands from appropriation. The government did not treat him and the other claimants as wanton intruders on the public domain, for then it might have ejected them by force. Instead of that it authorized proceedings for a judicial ascertainment of the merits of their respective claims. The act of 1877 embraces, therefore, under the designation of claimants and occupants, those who had made improvements, or claimed possession under an assertion of title or a right of pre-emption by reason of their location or settlement. It was for their benefit that the act was passed, in order that

they should not entirely forfeit their claims from location or settlement, and their improvements, but should have, except as to the portions reserved, the right of purchase. Parties succeeding, by operation of law or by conveyance, to the possession of such claimants and occupants, would succeed also to their rights. But lessees under a claimant or occupant, holding the property for him, and bound by their stipulation to surrender it on the termination of their lease, stand in no position to claim an adverse and paramount right of purchase. Their possession is in law his possession. The contract of lease implies not only a recognition of his title but a promise to surrender the possession to him on the termination of the lease. They, therefore, whilst retaining possession, are estopped to deny his rights. *Blight's Lessee* v. *Rochester*, 7 Wheat. 533.

This rule extends to every person who enters under lessees with knowledge of the terms of the lease, whether by operation of law or by purchase and assignment. The lessees in this case, and those deriving their interest under them, could, therefore, claim nothing against the plaintiff by virtue either of their possession, for it was in law his possession, or of their improvements, for they were in law his improvements, and entitled him to all the benefits they conferred, whether by pre-emption or otherwise. Whatever the lessees and those under them did by way of improvement on the leased premises inured to his benefit as absolutely and effectually as though done by himself.

Whenever Congress has relieved parties from the consequences of defects in their title, its aim has been to protect those who, in good faith, settled upon public land and made improvements thereon; and not those who by violence or fraud or breaches of contract intruded upon the possessions of original settlers and endeavored to appropriate the benefit of their labors. There has been in this respect in the whole legislation of the country a consistent observance of the rules of natural right and justice. There was a time, in the early periods of the country, when a party who settled in advance of the public surveys was regarded as a trespasser, to be summarily and roughly ejected. But all this has been changed within the last half century. With the acquisition of new territory, new fields

of enterprise have been opened, population has spread over the public lands, villages and towns have sprung up on them, and all the industries and institutions of a civilized and prosperous people have been established, with the church and school-house by their side, before the surveyor with his quadrant and line appeared.

With absolute confidence these pioneers have relied upon the justice of their government, and they have never been disappointed. The most striking illustrations of this confidence, and of the just action of the government, are found in the settlement of Oregon and California. Before any laws of the United States had been extended to Oregon, enterprising men crossed the plains and took possession of its fertile fields. They organized a provisional government embracing guaranties of all private rights. They passed laws under which persons and property were protected and justice administered with as much care and wisdom as in old communities. They prescribed regulations for the possession and occupation of land among themselves, and when the laws of the United States were extended over the country those regulations were respected, and the rights acquired under them recognized and enforced.

On this subject Mr. Justice Miller, speaking for the court in *Lamb* v. *Davenport*, said of the settlement upon the land which now embraces the town of Portland: "It is sufficient here to say that several years before that [the donation] act was passed, and before any act of Congress existed by which title to the land could be acquired, settlement on and cultivation of a large tract of land, which includes the lots in controversy, had been made, and a town laid off into lots, and lots sold, and that these are a part of the present city of Portland. Of course no legal title vested in any one by these proceedings, for that remained in the United States; all of which was well known and undisputed. But it was equally well known that those possessory rights and improvements placed on the soil were, by the policy of the government, generally protected, so far at least as to give priority of the right to purchase whenever the land was offered for sale, and when no special reason existed to the contrary. And though these

rights or claims rested on no statute, or any positive promise, the general recognition of them in the end by the government, and its disposition to protect the meritorious actual settlers, who were the pioneers of emigration in the new territories, gave a decided and well understood value to these claims. They were all subject to bargain and sale, and as among the parties to such contracts they were valid. The right of the United States to dispose of her own property is undisputed, and to make rules by which the lands of the government may be sold or given away is acknowledged; but subject to these well known principles, parties in possession of the soil might make valid contracts, even concerning the title, predicated upon the hypothesis that they might thereafter lawfully acquire the title, except in cases when Congress had imposed restrictions on such contracts." 18 Wall. 307, 313, 314.

So in California the discovery of the precious metals was followed, as is well known, by a large immigration to the State which increased her population in a few years to several hundred thousand. The majority of the immigrants at first found their way into the mineral regions and became seekers of gold. But still a very large number settled upon the farming lands, erected houses thereon, planted vineyards and orchards, and subjected portions to cultivation. Much of this was in advance of the public surveys, and even before the passage of an act of Congress opening the agricultural lands to settlement, and providing for the sale of the mineral lands. Yet the progress of the country was not thereby stayed. The first appropriator of mineral lands within certain limits, or the first settler on agricultural lands to the extent prescribed by the pre-emption laws in force in other States, was recognized everywhere as having a better right than others to the claim appropriated, or to the land settled upon. In all controversies, except as against the government, he was regarded as the original owner from whom title was to be traced. And when the government extended its surveys over the agricultural lands it gave the privilege of purchasing—the pre-emption right—to the first settler, requiring only that his possession should be continued, accompanied with improvement. And when it allowed the mineral lands

to be sold, it was to the original appropriator, or to those deriving their claim from him, that title was given. In no instance in the legislation of the country have the claims of an intruder upon the prior possession of others, or in disregard of their rights, been sustained. Laborers occupying mining claims, or agricultural lands, whilst working for the first appropriator or settler, acquired no pre-emptive rights over him to such claims or lands; nor did any permissive occupation under him, as tenant or otherwise, impair his rights. To construe the act of 1877 so as to give to lessees a better right than their landlord to purchase the land of which he had been in occupation more than a third of a century, would require us to attribute to Congress not only the intention to do him flagrant injustice, but to depart from its previous uniform and long settled policy to protect the pioneer and original settler upon the public domain.

In the dealing of the government with occupants of lots in towns built upon the public lands, we have a further illustration of the good faith which is exacted from parties seeking the title of the United States. The Town Site Act of Congress of May 23d, 1844, provides that whenever any portion of the surveyed public lands has been settled upon and occupied as a town site, it shall be lawful, if the town be incorporated, for the corporate authorities, and if not incorporated, for the judge of the County Court, to enter at the proper land office, and at the minimum price, such land "in trust for the several use and benefit of the occupants thereof, according to their respective interests; the execution of which trust as to the disposal of the lots in such town, and the proceeds of the sale thereof, to be conducted under such rules and regulations as may be prescribed by the legislative authority of the State or Territory in which the same is situated." 5 Stat. 657. The act of Congress of March 3d, 1853, extended the provisions of this act, and, with certain exceptions, made the whole of the public lands, not being mineral, occupied as towns or villages, subject to like entry, whether settled upon before or after they were surveyed.

In *Ricks* v. *Reed*, decided in 1862, the proper construction

of the act was a question before the Supreme Court of Cali-
fornia, and the court said : " It is true the entry of the town
lands by the corporate authorities or county judge is, under
the act of Congress, ' in trust for the several use and benefit
of the occupants thereof, according to their respective in-
terests ; ' but this provision does not establish that it was the
intention of Congress to give the benefits of the entry to mere
temporary occupants of particular tracts at the date of the
entry, without reference to the character of their occupancy,
and thereby, in many instances, deprive the original *bona fide*
settlers of the premises and improvements in favor of those
who had, by force or otherwise, intruded upon their settlement.
Were such the effect of the provision in question, the trespasser
of yesterday, or the tenant of to-day, would often be in a better
position than the parties who, by their previous occupation and
industry, had built up the town and made the property valu-
able.   We do not think Congress could have contemplated that
results of this nature should follow from its legislation, but, on
the contrary, that it intended that the original and *bona fide*
occupants should be the recipients of the benefits of the entry to
the extent, at least, of their interest—that is, of their actual
occupancy and improvements."   19 Cal. 551, 575.

The provision of the act that the commissioners " shall finally
determine the right of each claimant or occupant " to purchase
the land or a portion of it, does not necessarily withdraw that
determination from the consideration of the court.   It is final
so far as the land department is concerned.   By the general
law all proceedings for the alienation of the public lands, from
the incipient steps to a patent, are placed under the supervision
of that department.   The provision in question takes the action
of the board, in the particulars mentioned, from that super-
vision.   In effect it substitutes the board in the place of the
ordinary land officers, with only a modification of duties and
powers adapted to the peculiar circumstances of the case.   It
does not withdraw its decisions fom the correcting power of
the court when the board has misconstrued the statute, and
thus defeated its manifest purpose, and made its benefits inure
to those who were never in the contemplation of Congress,

and therefore were not intended to be the recipients of its bounty.

The powers of the commissioners under the act of 1877 are not essentially different from those of the receiver and register of the land office in cases of conflicting claims to pre-emption. The latter officers must hear the evidence of parties, and decide as to which has the better right to the patent certificate. The judicial character of their investigation and determination is as great and important as that of the commissioners under the act of 1877. The acts done in both cases relate merely to the sale of public lands; and it is difficult to perceive any reason why, when private rights are invaded, the door should be closed against relief in the courts of the country in the one case more than in the other.

The statute, in requiring the commissioners to "finally determine the right of each claimant or occupant to purchase" parts of the reservation, recognizes the existence of rights as between different claimants, though equally without title so far as the government is concerned. But in their decision they have ignored the universally acknowedged right as between landlord and tenants, giving to the latter what could by no possibility belong to them in the relation which they occupied. Had Congress intended to invest the commissioners with absolute discretion in awarding the privilege of pre-emption of the several parcels of land, its language would have been different; it would not have required an examination of witnesses, a regard for existing boundaries, and a determination of rights. Everything in the statute, from the beginning to the end, indicates an intent that, in awarding the right of pre-emption, the commissioners should be governed, not by an arbitrary discretion, but by the existence of claims by possession, and a consideration of the mutual rights of parties as between one another. They had no right to disregard the very principle on which their appointment was based.

On matters depending upon conflicting evidence as to the extent of occupation and the value of improvements, and many other matters, the action of the commissioners is undoubtedly final; but upon the construction of the law, and particularly

as to the parties for whose benefit it is designed, it is subject, equally with all local boards of limited jurisdiction, to have its conclusions, if erroneous, reviewed and corrected by the judicial tribunals; at least the equities of third parties arising from contracts or fiduciary relations between them and the person to whom the commissioners may adjudge the right to pur-· chase, are not concluded by their action. This question was very fully and thoughtfully considered in *Johnson* v. *Towsley*, 13 Wall. 72. In that case the direct question was as to the effect to be given to the tenth section of the act of June 12th, 1858, which declared that appeals in cases of contest between different settlers for the right of pre-emption should thereafter be decided by the Commissioner of the General Land Office, "whose decision shall be final unless appeal therefrom be taken to the Secretary of the Interior." It was held that the finality there declared had reference only to the supervisory action of the land department; that after the title had passed from the government, and the question had become one of private right, the jurisdiction of courts of equity might be invoked to ascertain if the patentees did not hold in trust for other parties; and if it appeared that the party claiming the equity had established his right to the land upon a true construction of the acts of Congress, and by an erroneous construction the patent had been issued to another, the court would correct the mistake. In the opinion Mr. Justice Miller, speaking for the court, referred to the general doctrine that when a special tribunal has authority to hear and determine certain matters arising in the course of its duties, its decision within the scope of its authority is conclusive upon all others, and said:

"That the action of the land office in issuing a patent for any of the public lands, subject to sale by pre-emption or otherwise, is conclusive of the legal title, must be admitted under the principle above stated; and in all courts, and in all forms of judicial proceedings, where this title must control, either by reason of the limited powers of the court, or the essential character of the proceeding, no inquiry can be permitted into the circumstances under which it was obtained. On the other

hand, there has always existed in the courts of equity the power in certain classes of cases to inquire into and correct mistakes, injustice and wrong, in both judicial and executive action, however solemn the form which the result of that action may assume, when it invades private rights ; and by virtue of this power the final judgments of courts of law have been annulled or modified, and patents and other important instruments issuing from the crown, or other executive branch of the government, have been corrected or declared void, or other relief granted. No reason is perceived why the action of the land office should constitute an exception to this principle. In dealing with the public domain under the system of laws enacted by Congress for their management and sale, that tribunal decides upon private rights of great value, and very often, from the nature of its functions, this is by a proceeding essentially *ex parte*, and peculiarly liable to the influence of frauds, false swearing and mistakes. These are among the most ancient and well-established grounds of the special jurisdiction of courts of equity just referred to, and the necessity and value of that jurisdiction are nowhere better exemplified than in its application to cases arising in the land office."

This case is a leading one in this branch of the law, and has been uniformly followed. The decision aptly expresses the settled doctrine of this court with reference to the action of officers of the land department, that when the legal title has passed from the United States to one party, when in equity, and in good conscience, and by the laws of Congress it ought to go to another, a court of equity will convert the holder into a trustee of the true owner, and compel him to convey the legal title. This doctrine extends to the action of all officers having charge of proceedings for the alienation of any portion of the public domain. The parties actually entitled under the law cannot, because of its misconstruction by those officers, be deprived of their rights. *Townsend* v. *Greeley*, 5 Wall. 326, 335; *Carpentier* v. *Montgomery*, 13 Id. 480, 496; *Shepley* v. *Cowan*, 91 U. S. 330; *Moore* v. *Robbins*, 96 U. S. 530; *Quinby* v. *Conlan*, 104 U. S. 420; *Smelting Company* v. *Kemp*, Id. 636.

The bill is open to the objection that it does not allege that the heirs of Ballantine have acted upon the award, and purchased the lands in controversy; but their counsel makes no point upon this omission, and admits that they have in fact purchased.

It follows from the views expressed that

*The decree of the court below must be reversed and the cause remanded with instructions to overrule the demurrer and to take further proceedings in accordance with this opinion, the plaintiff to have leave to amend his bill and the defendants to answer.*

Mr. Chief Justice Waite, with whom concurred Harlan, Woods, and Blatchford, JJ., dissenting.

I am unable to agree to this judgment. In my opinion the act of March 3d, 1877, granted a new right to the occupants of the Hot Springs Reservation, and provided a special tribunal for the settlement of all controversies between conflicting claimants. The right and the remedy were created by the same statute, and, consequently, the remedy thus specially provided was exclusive of all others. No provision was made for a review of the decisions of the tribunal. Its determination, therefore, of all questions arising under the jurisdiction must necessarily be conclusive, and not open to attack collaterally. It seems to me there is a very broad distinction between this case and that of *Johnson* v. *Towsley,* 13 Wall. 72, and others of that class. Here a special tribunal has been created for a special purpose. It has been clothed with power to compel the attendance of witnesses "and to finally determine the right of each claimant or occupant to purchase" from the United States, under the provisions of the act of Congress, the ground he occupies or claims. The duties of the tribunal are judicial in their character, and their decisions evidently intended to be binding on the parties. The question now is not whether, if Rector had kept away from the tribunal and Gibbon had got a title under his occupancy, he could be charged as trustee for Rector on account of his tenancy, but whether, having appeared before the tribunal and been beaten in a contest with Gibbon,

on that identical question, Rector can in this suit correct the errors of the tribunal in its decision. I think he cannot. If he can, it is difficult to see why all the decisions of the tribunal are not open to revision by the courts.

I am authorized to say that Justices HARLAN, WOODS, and BLATCHFORD concur with me in this opinion.