## SMITH V. TOWNSEND.

### [*Opinion Filed Feb. 1, 1892.*]

1. PUBLIC LANDS—*Issue of Patent—Equitable Jurisdiction*—Where the officers of the United States land department, acting on a known state of facts, draw a conclusion of law and issue a patent for a portion of the public domain, a court of equity may entertain a complaint praying that the patentee be decreed a trustee for plaintiff, and that he be compelled to convey the legal title.

2. HOMESTEAD ENTRYMAN—*Qualifications.*—Under Act Cong. March 2, 1889. (25 U. S. St. at Large, p. 1005,) relating to the opening of certain land in Oklahoma for settlement, which provides that, "until said lands are opened for settlement by proclamation of the president no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall ever be permitted to enter any of said lands or acquire any right thereto," and under the proclamation of the president, declaring that the lands would be opened for settlement at the hour of 12 o'clock noon of the 22d day of April, 1889, an employe of the A., T. & S. F. R. R., who by virtue of his position, remains on the land from March 2, 1889, to noon of April 22d cannot take advantage of his presence to select and claim a homestead.

*Appeal from the district court of Oklahoma County, Hon. J. G. Clark, Judge.*

Action by Alexander F. Smith against Eddie B. Townsend for the purpose of having defendant declared the trustee of certain land for plaintiff, and praying for a conveyance of the legal title. Decree for defendant. Plaintiff appeals. Affirmed.

*Amos Green and J. L. Brown*, for appellant.

*John F. Stone* and *Johnson & Howard*, for appellee.

The opinion of the court was delivered by

GREEN, C. J. On the 30th day of April, 1891, appellant, Alexander F. Smith, filed his complaint in the district court of Oklahoma county, against the appellee, Eddie B. Townsend, for the purpose of hav-

ing the appellee declared a trustee for the appellant as to the northeast quarter of sec. 35, in T. 14, N. of range 3, W., and for a conveyance of the legal title of said real estate by appellee to the appellant.

It is everred in appellant's complaint, *inter alia* that during the year 1889, he was a citizen of the United States, over the age of twenty-one years, and the head of a family, and, in all respects, qualified to enter public lands under the homestead laws of the United States.

That, during the years 1888 and 1889, the Atchison, Topeka & Santa Fe Railroad Co. was engaged in operating a railroad through the Indian Territory, and had set apart to its use a right of way through said territory, as provided by treaty with the various Indian tribes and the acts of congress, might be done; and, as a part of said right of way, was, during those years, holding a piece of ground, at Edmond station, in said territory, and had thereon station houses for the use of the necessary employes of said railroad company.

That, during the years 1888 and 1889, appellant was one of the persons employed by said railroad company, as one of its necessary employes, and was engaged as one of its track men to work upon and keep said railroad track in good repair; and, during all that time, appellant resided in a station house of said railroad company, located on said right of way, at Edmond, and, up to noon of April 22, 1889, remained continuously on said right of way, as by law required. That the dwelling of appellant on said right of way was commenced and carried on, and the labor on said railroad was performed, and appellant's coming within the Indian Territory was with no intention to take lands, but for the purpose of performing necessary labor on said railroad.

That, when the lands surrounding said station, at Edmond, were thrown open to settlement, under the

acts of congress of March 1 and 2, 1889, under the proclamation of the president, of date of March 23, 1889, appellant was at Edmond station, and on said right of way, and, soon after the hour of noon, on April 22, 1889, went upon the northeast quarter of Sec. 35, in Tp. 14, N. of range 3, W., and settled on the same as his homestead, and with the intention of occupying the same as his homestead under the laws of the United States.

That, pursuant to said intention, he erected a house thereon and otherwise improved the same, and dwelt on it, as his home, as required by law, and, in further pursuance of said intention, duly made homestead entry of said land at the United States land office, at Guthrie, on the 23d day of April, 1889; and that he has, ever since, continued to reside on said land, and to occupy the same as his home, and now occupies the same as his home.

That, on the 22d day of June, 1889, the appellee filed in the land office a contest, asking that said homestead entry of appellant be cancelled, for the reason that appellant, had, after March, 2, 1889, and before noon of April 22, 1889, entered upon and occupied the lands described in, and declared opened to settlement by the president's proclamation of March 23, 1889; and that said contest was heard in the land office at Guthrie, on the following statement of facts, made and filed by the agreement of appellant and appellee:

"Alexander F. Smith had been for a long time, prior to March 2, 1889, in the employ of the A. T. & S. F. R. R. Co., as a section hand, and, on Jan. 30, 1889, came to Edmond, Ok. Ty., in that capacity bringing his family with him. He did not enter the Territory with expectation, or intention, of taking land in the Oklahoma country. He remained in the employ of the railroad company until noon of April 22, 1889, Santa Fe railroad time, when he removed his tent to a point about a hundred and fifty yards distance from the right

of way of said railroad, and on the land in controversy, where he put it up and moved into it.    From Jan. 30, 1889, Smith lived with his family in his tent on the right of way of the A. T. & S. F. railroad, where it passes through the land in controversy.    Prior to April 22, 1889, Smith had indicated his intention to take the land in controversy, by stating the fact to his fellow workmen, but had done no act toward carrying out said intention.    A notice was posted at the station at Edmond by the A. T. & S. F. R. R. Co., warning all employes that if they expected to take land they must leave the Oklahoma country, and this fact was called to Smith's notice.    Smith has, since noon of April 22, 1889, continued to reside upon, cultivate and improve said land, in good faith, as a homestead, and now has improvements thereon. Smith is a legal qualified home steader unless excluded by reason of his being in the Oklahoma country prior to April, 1889.    Smith is at present, in the employ of the A. T. & S. F. R. R. Co., and has been, most of the time, since April 22, 1889."

That, on the trial of said contest, the local land office decided that, as a matter of law under the agreed facts, appellant was entitled to the land; and that appellee appealed from the decision of the local land office to the commissioner of the generel land office who reversed the decision of the local land office, and ordered appellant's homestead entry to be cancelled. That appellant appealed to the Secretary of the Interior, who affirmed the decision of the commissioner, and on the 28th day of Feb., 1891, ordered the homestead entry of appelant to be cancelled; and that the same was cancelled; and that the appellee, on the 12th day of March, 1891, made homestead entry of said land.

That, on, or about, the 30th day of April, 1891, appellee made final proof on said land, and commuted the same, and paid to the land officers one dollar and a quarter per acre, and obtained his final receipt, and now holds the legal title, and is entitled to a patent.

That the commissioners and Secretary of the Inter-

ior committed error of law in said matter, and miscon-
strued the law in relation thereto in this:    They held
that, under the facts so agreed upon, appellant was
barred from entering lands in Oklahoma, and had for-
feited his right to enter a homestead in the land de-
scribed in the president's proclamation of March 23,
1889, by being  within said lands between March
2,  1889, and noon of April 22, 1889, that as
matter of law, appellant was not disqualified to
make homestead entry of land within said boundaries;
 and, had the law been properly construed, appel-
lant's homestead entry would not have been cancelled;
and that the value of said land is the sum of six thous-
and dollars.

The prayer of appellant's complaint is that appellee
may be decreed to hold the land *in trust*, for appellant,
and may be decreed to convey the legal title to appel-
lant, concluding with the general prayer for equitable
relief.   And the complaint was duly verified by appel-
lant.

On the 5th day of May, 1891, appellee appeared in
the action and filed a demurrer to appellant's complaint
stating as grounds of demurrer, *first*, that the court .
had no jurisdiction, and. *second*, that the complaint did
not state facts sufficient to constitute a cause of action,
and the court sustained the demurrer and dismissed the
complaint at the cost of the appellant; to which action
of the court appellant excepted, and prayed an appeal
to this court, and brings the record here and assigns for
error the sustaining of the demurrer, and the dismissal
of the complaint at the cost of the appellant.

The questions presented for the consideration of this
court are questions of great importance, and their
determination will affect interests of claimants in some
of the most valuable land in the territory, but, what-
ever the results may be, the court, has but one duty to

perform, and that is, to declare the law as the court understands the law to be.

The first question presented by the demurrer challenges the jurisdiction of the district court as to the subject matter of the suit.   That the district court had jurisdiction of the subject matter of the suit, cannot be, and is not, seriously questioned.   It is a court of general jurisdiction in all cases at law and in equity. (Organic Act, § 9.)   And the question has been so frequently passed upon by the Supreme Court of the United States, that it is no longer open to discussion.   (*Johnson v. Townsley*, 13 Wall., 72; *Rector v. Gibbon*, 111 U. S. 276.)

In *Rector v. Gibbon, supra*, the court, in speaking of *Johnson v. Townsley*, said,

"This case is a leading one in this branch of the law, and has been uniformly followed.   The decision aptly expresses the settled doctrine of this court with reference to the action of the officers of the land department, that, when the legal title has passed from the United States to one party, when in equity, and in good conscience, and by the laws of congress, it ought to go to another, a court of equity will convert the holders into a trustee of the true owner, and compel him to convey the legal title.   This doctrine extends to the action of all officers having charge of proceedings for the alienation of any portion of the public domain.   The parties actually entitled under the law cannot, because of the misconstruction by those officers, be deprived of their rights."

In this case there are no controverted facts, as it was tried and determined before the officers of the land department, including the Secretary of the Interior, on the statement of facts agreed to, and which is copied at large in the complaint; but appellant's contention is, that the officers of the land department misconstrued the law, and thus gave the appellee the land that should have been given to appellant, and would have been

given to appellant had the law been correctly applied to the admitted facts, and which brings this case clearly within the rule as to jurisdiction of a court of equity, announced by the decisions cited above.

The *second* ground of demurrer, that appellant's complaint does not state facts sufficient to constitute a cause of action, presents a most important question in this case, and one which is *res integra* in the courts, although it has been frequently passed on in the land department    If the facts stated do not constitute a cause of action, it is because appellant was disqualified under the law to take the  homestead in controversy, by reason of his being within the lands opened to settlement, between the *second* day of March, 1889, and *noon* of April 22, 1889.  It is needless to say that this question can only arise with reference to the homestead settlement of the public domain in the Territory of Oklahoma.

A part of the public lands in the Territory of Oklahoma, that were open to  settlement  at noon of the 22d day of April, 1889 by proclamation of the president of the United States, were obtained by the United States from the Seminole Indians; and their lands lie between the north and  south branches of the Canadian river; and a part of the lands so opened to settlement, were obtained from the Muscogee or Creek nation of Indians; and their lands· lie between the north branch of the Canadian river and the south line of the Cherokee Outlet.

The act of congress, approved March 1, 1889, accepting, ratifying and confirming the article of cession and agreement with the Muscogee or Creek nation of Indians (U. S. Stat. at large, Vol. 25, p. 759), provides as follows:

"Sec. 2. That the lands acquired by the United States under said agreement shall be a part of the public do-

main, but they shall only be disposed of in accordance with the laws regulating homestead entries and to the persons qualified to make such homestead entries, not exceeding one hundred and sixty acres to one qualified claimant. And the provisions of § 2301 of the Revised Statutes of the United States shall not apply to any lands acquired under said agreement. Any person who may enter upon *any part* of said lands in said agreement mentioned prior to the time that the same are open to settlement by act of congress shall not be permitted to occupy or to make entry *of such lands* or lay any claim thereto."

These provisions of the act of March 1, 1889, were, however, only applicable to the lands obtained from the Muscogee, or Creek nation of Indians; but by act of congress, approved March 2, 1889, (U. S. Stat. at large, Vol. 25, p. 1005) it was provided:

"Sec. 13. That the lands acquired by the United States under said agreement shall be a part of the public domain, to be disposed of only as herein provided, and sections sixteen and thirty-six of each township, whether surveyed or unsurveyed, are hereby reserved for the use and benefit of the public schools, to be established within the limits of said lands under such conditions and regulations as may be hereafter enacted by congress.

"That the lands acquired by conveyance from the Seminole Indians hereunder, except the sixteenth and thirty-sixth sections, shall be disposed of to actual settlers under the homestead laws only, except as herein otherwise provided. (Except that § 2301 of the Revised Statutes shall not apply.) And provided further, that any person who having attempted to, but for any cause failed, to secure a title in fee to a homestead under existing law, or who made entry under what is known as the commuted provision of the homestead law, shall be qualified to make a homestead entry upon said lands. And provided further, That the rights of honorably discharged Union soldiers and sailors in the late civil war as defined and and described in §§ 2304 and 2305 of the Revised Statutes shall not be abridged. And provided further, that each entry shall be in square form as nearly as practi-

cable, and no person be permitted to enter more than one quarter section thereof, but until said lands are opened for settlement by proclamation of the President, no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall ever be permitted to enter any of said lands or acquire any right thereto.

"The Secretary of the Interior may, after said proclamation, and not before, permit entry of said lands for townsites, under §§ 2387 and 2388 of the Revised Statutes, but no such entry shall embrace more than one-half section of land.

"That all the foregoing provisions with reference to lands to be acquired from the Seminole Indians, including the provisions pertaining to forfeiture shal lapply to and regulate the disposal of the lands acquired from the Muscogee or Creek Indians by articles of cession and agreement made and concluded at the city of Washington on the nineteenth day of January, in the year of our Lord eighteen hundred and eighty-nine."

In pursuance of the provisions of the act of March 2, 1889, the President of the United States, on the 23d day of March, 1889, issued his proclamation, therein citing the act of March 1, 1889, and the act of March 2, 1889, and declaring that the lands therein described would be opened to settlement, at the hour of 12 o'clock, *noon*, of the 22d day of April, 1889, and gave the following warning:

"Warning is hereby again expressly given that no person entering upon and occupying said lands before, said hour of 12 o'clock, noon, of the 22d day of April, A. D., 1889, hereinbefore fixed, will ever be permitted to enter any of said lands or acquire any rights thereto and that the officers of the United States will be required to strictly enforce the provisions of the act of congress to the above effect."

It is contended on behalf of appellant that his presence within the lands, declared open to settlement by the proclamation of the President, after March 2, 1889, and before *noon* of April 22, 1889, was lawful and that

he did not *enter upon and occupy* any part of *said lands* before *noon* of April 22d, 1889, in violation of the act of March 2, 1889, and the President's proclamation; and that he was not disqualified to take the land in controversy under the provisions of the act of March 2, 1889.

The qualification of appellant to settle upon and enter the land in controversy, as a homestead, under the homestead laws of the United States, depends entirely upon the construction and meaning to be given to the act of March 2, 1889. The prohibitory clause of the act is:

"But until the said lands are open for settlement by proclamation of the President, no person shall be permitted *to enter upon and occupy* the same; and no person violating this provision shall ever be permitted to enter any of said lands, or acquire any right thereto."

There can be no doubt that congress has the power, in providing for the disposition of the public lands to prescribe the qualifications of homestead settlers; and only such persons as possess the qualifications prescribed can avail themselves of the benefits of the homestead laws. And the qualifications prescribed by § 13 of the act of March 2, 1889, were within the power of congress to enact.

It is earnestly and ably contended that the prohibitory clause of the act of March 2, 1889, is a penal law, and must be construed strictly; and that before appellant can be held to be disqualified, his acts must come within the letter as well as the spirit of the clause. Such is the universal rule of construction of penal statutes, except when changed by statutory enactment, as has been done in some of the states.

But the clause under consideration is not a penal statute. It creates no crime and imposes no penalty or forfeiture. It simply prescribes the qualifications of homestead settlers on the public lands mentioned in the act.

Penal statutes are those by which punishments are imposed for the transgression of the law, or the penalties are prescribed for the commission or omission of some act, which are recoverable in a criminal or civil action. (Southerland on Stat. Con., § 208; Endlich on Interp. Stat., § 231.)

The question then, is, did appellant *enter upon and occupy* any part of the lands opened to settlement by proclamation of the President, after the *second* day of March, 1889, and before *noon* of April 22, 1889, within the meaning of the prohibitory clause of the act of March 2, 1889? And a solution of this question necessarily involves an interpretation and construction of the words *enter upon and occupy* as used in that act.

In § 2 of the act of March 1, 1889, which prescribes the qualifications of homestead settlers upon the lands acquired from the Muscogee or Creek Nation of Indians, and which was approved one day before the approval of the act of March 2, 1889, the prohibitory clause provides:

"Any person who may enter upon any part of said lands in said agreement mentioned, prior to the time that the same are open to settlement by act of congress, shall not be permitted to occupy, or to make entry of such lands, or lay any claim thereto."

As § 2 of the act of March 1, 1889, and § 13 of the act of March 2, 1889, are parts of two acts passed at the same session of congress, and were approved and took effect within one day of each other, and are *in pari materia*, they must be considered as parts of the same act, and must be read and construed together. Statutes passed on the same day, on the same subject must be construed as sections of the same act; and statutes passed at the same session on the same subject must be construed as one act. (*St. Martin v. New Orleans*, 14 La. Ann. 113; *People v. Jackson*, 30 Cal. 427; *Cain v. State*, 20 Tex. 365.)

When these statutes are read together as parts of one act, as they must be, is the language so clear and un-ambiguous as to leave no room for construction? Clearly not; and it becomes necessary to ascertain the intention of congress, and such intention must control in the construction of the prohibitory clauses of both acts. And the intention of congress must be gathered not only from the language of the acts, but from the cause, or necessity, of the enactments, and from other circumstances.

No clearer statement of the law which governs in the construction of statutes can be found than in the opinion of the court in *People v. Utica Insurance Co.* 15 Johnson, 358, where it is said:

"That in construing a statute, the intention of the legislature is a fit and proper subject of inquiry, is too well settled to admit of dispute. That intention is to be collected from the act itself, and other acts *in pari materia.* It may not, however, be amiss to state and keep in view some of the best established *and well settled rules on the subject.* Such construction ought to be put upon a statute as may best answer the intention which the makers had in view. And this intention is sometimes to be collected from the cause, or necessity, of making the statute, and sometimes from other circumstances; and whenever such intention can be discovered, it ought to be followed, with reason and discretion, in the construction of the statute, although such construction seems contrary to the letter of the statute. Where any words are obscure, or doubtful, the intention of the legislature is to be resorted to, in order to find the meaning of the words. A thing which is within the intention of the makers of a statute, is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers; and such construction ought to be put upon it as does not suffer it to be eluded."

It is conceded that the language used in the prohibi-

tory clause of § 2 of the act of March 1, 1889, is clear, and that the intention of congress was, that no person should *enter upon*, that is, *go upon*, any part of the lands mentioned in that act, prior to the time they were declared opened to settlement by act of congress, and that any person who did so enter, with the intention, or for the purpose, of settling upon any part of the same, when they should be open to settlement, should not be permitted to occupy, or make entry of such lands, or lay any claim thereto.

By the provisions of this act congress absolutely excluded *from within the limits of the lands* all persons who desired, or intended, to avail themselves of the benefits of the homestead laws of the United States, until the time was fixed for their being opened to settlement, and disqualified any person who entered upon any part of the same, before that time, to occupy, or make entry, or to lay any claim thereto. Here the intention of congress is clear beyond all question.

But it is contended with much earnestness, and not without plausibility, that the act of March 2, 1889, prescribes a different rule, and repeals by implication, the act of March 1, 1889, so far as it defines the qualifications of persons who shall be permitted to settle upon and make homestead entry of such lands; and that more than an *entry upon* the lands is necessary to disqualify; that the party must have *entered upon and occupied* some of the lands, prior to the time they were opened to settlement, to come within the disqualifying clause of that act.

Repeals by implication are not favored in the law; and, as the two acts must be read and construed together as one act, it is the duty of the court to harmonize them and give effect to each one, if possible. It is clear that congress did not intend to repeal § 2 of the act of March

in 1889, by § 13 of the act of March 2, 1889, and that both sections have been, and are still, in force.

After the approval of the acts of March *first* and *second*, 1889, and the settlement of all the lands opened to settlement by the proclamation of the President, congress, by act of May 2, 1890, providing a territorial government for the territory of Oklahoma, expressly · recognized and declared § 2 of the act of March 1, 1889, and § 13 of the act of March 2, 1889, to be in force; and § 18 of the act of May 2, 1890, provides:

"The lands within said Territory of Oklahoma, acquired by cession of the Muscogee (or Creek) nation of Indians, confirmed by act of Congress approved March first eighteen hundred and eighty-nine, and also the lands acquired in pursuance of an agreement with the Seminole Nation of Indians by release and conveyance, dated March sixteenth, eighteen hundred and eighty-nine, which may hereafter be opened to settlement, shall be disposed of under the provisions of sections twelve, thirteen and fourteen of the 'Act making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes, for the year ending June thirtieth, eighteen hundred and ninety, and for other purposes' approved March second, eighteen hundred and eighty-nine, and under section two of an 'Act to ratify and confirm an agreement with the Muscogee (or Creek) Nation of Indians in the Indian Territory, and for other purposes,' approved March first, eighteen hundred and eighty-nine, provided, however, that each settler under and in accordance, with the provisions of said acts shall, before receiving a patent for his homestead, pay to the United States for the land so taken by him, in addition to the fees provided by law, the sum of one dollar and twenty-five cents per acre."

By § 20 of the act of May 2, 1890, the provisions of § 2 of the act of March 1, 1889, and § 13 of the act of March 2, 1889, are made applicable to all entries in the Territory of Oklahoma; and the section provides as follows:

"That the procedure in applications, entries, contests, and adjudications in the Territory of Oklahoma shall be in the form and manner prescribed under the homestead laws of the United States and the general principles and provisions of the homestead laws, except as modified by the provisions of this act; and the acts of Congress approved March first and second, eighteen hundred and eighty-nine, heretofore mentioned, shall be applicable to all entries made in said Territory, but no patent shall be issued to any person who is not a citizen of the United States at the time of making final proof."

It cannot be presumed that congress intended to establish one rule of disqualification for the Muscogee lands and another rule for the Seminole lands, as it would be unreasonable to do so; but it is manifest, from a consideration of all the acts *in pari materia*, that congress intended the same rule should apply to both; and that congress meant and intended by the use of the words, *enter upon and occupy*, in § 13 of the act of March 2, 1889, just what was intended and meant by the use of the words, *enter upon*, in § 2 of the act of March 1, 1889; and thus all the legislation on the subject is harmonized and given effect.

It is useless to speculate upon the meaning of the words, *enter upon*, and, *enter upon and occupy*, for these words have no synonyms that convey their meaning more clearly than they do themselves. However, no person can occupy land, in the sense here used, without having entered upon it, and no person can enter upon land, in the same sense here used, without occupying some part of it for the time being. But it is enough that congress intended that all persons, who intended to avail themselves of the privileges and benefits of the acts of congress opening these lands to. settlement, should remain without the limits of the lands until, by proclamation of the President, they should be permitted to go in and make homestead and townsite settlement upon them.

The construction here put upon the act of March 2, 1889, is in accord with the interpretation as made by the executive of the government, and found in that clause of the President's proclamation warning all persons not to enter upon and occupy the lands, before twelve o'clock, *noon*, of April 22, 1889, and requiring the officers of the United States to strictly enforce the act of congress. If all persons had been permitted to *enter upon* the lands, before the time appointed for opening the same to settlement, as is contended they had the right to do, it is difficult to perceive how the officers of the United States could have enforced the act of congress by preventing their occupying the lands upon which they had entered. In such case, to say that to *enter upon* is not, at the same time, to *occupy*, is as near the *reductio ad absurdu* as well can be.

The contention that, in order to disqualify a homestead settler, under the act of March 2, 1889, he must have entered upon and occupied some particular quarter section, in violation of that act, and that the disqualification attaches only as to that particular tract, is fully met by the construction which is here put upon that act, and needs no further discussion.

Much emphasis is placed by counsel for appellant on the following clause of § 13 of the act of March 2, 1889:

"That all the foregoing provisions with reference to lands to be acquired from the Seminole Indians, including the provisions pertaining to forfeiture, shall apply to and regulate the disposal of the lands acquired from the Muscogee and Creek Indians by articles of cession and agreement made and concluded at the city of Washington on the nineteenth day of January in the year of our Lord eighteen hundred and eighty-nine."

And it is contended that the words, "including the provisions pertaining to forfeiture," apply to the prohibitory clause immediately preceding, and clearly show that congress intended to enact a rule of disqualifica-

tion different from the one prescribed by § 2 of the act of March 1, 1889, and to apply that rule to the Muscogee lands as well as the Seminole lands.

A careful reading of § 12 of the act of March 2, 1889, will show that the words, "including the provisions pertaining to forfeiture," must be referred to the forfeiture declared by the last clause of that section which is as follows:

"And all grants, or pretended grants, of said lands and interest, or right therein, now existing in, or on behalf of any railroad company, except rights of way and depot grounds, are hereby declared to be forever *forfeited* for breach of condition."

And Congress intended that this clause declaring a forfeiture should apply to the Muscogee lands also.

Contemporaneous exposition of a statute is entitled to considerable weight in determining what construction should be put upon it by the courts.

"Great regard," says Lord Coke, "ought, in construing a statute, to be paid to the construction which the sages of law, who lived about the time, or soon after it was made, put upon it, because they were best able to judge of the intention of the makers at the time the law was made. And in the civil law the maxim was, *contemporanea expositio est fortissima in lege.*

It is a part of the history of Oklahoma, of which the court takes judicial notice, that after the issuing of the President's proclamation, declaring the lands therein described opened to settlement at *noon* of April 22, 1889, and warning all persons not to *enter upon and occupy* the same before that time, by *universal consent* the act of March 2, 1889, was construed to prohibit the crossing of the lines and the entering upon any part of the lands by persons intending to make homestead settlement thereon, prior to the hour fixed by the President's proclamation. And in obedience to the law as thus interpreted, the thousands of homestead set-

tlers, who came in at the time appointed for the open-
ing, remained outside the limits of the lands until it
was lawful for them to enter.

The stipulation of facts, set out at large in the com-
plaint, shows that the appellant was at Edmond, a sta-
tion on the A. T. & S. F. railroad, and within the lands
described in the President's proclamation, on the date
of the approval of the act of March 2, 1889, and at the
date of the issuing of the proclamation, and continued
there, as a section hand on the railroad, until *noon* of
April 22, 1889, when he went immediately upon the
land in controversy and made homestead settlement,
and, afterwards, made homestead entry at the land
office at Guthrie. Before the time fixed for the open-
ing, he had formed the intention of settling upon this
particular tract of land, and claiming the same under
the homestead laws.

As appellant was lawfully at Edmond before and on
the second day of March, 1889, and from that day to
*noon*, April 22, 1889, it is claimed he had a right to
make homestead settlement on the land in controversy,
at the time, and in the manner he did, and that he was
not disqualified to do so under the provisions of the act
of March 2, 1889.

For the purpose of laboring on the railroad, as a sec-
tion hand, appellant was lawfully at Edmond; but for
the purpose of taking this tract of land under the home-
stead laws of the United States, his presence at that
place was forbidden by the acts of March *first* and *sec-
ond*, 1889, and was unlawful. He had been warned by
the railroad company to go out, but refused to do so,
and his duties were not such as to require him to re-
main in up to the time of the opening; and he took
advantage of his being at the land, and secured a settle-
ment on it before others, who obeyed the law and re-
mained outside, had an opportunity to reach it even by
railroad transit.

Nothing is more apt, on the question under discussion, than the language of the Secretary of the Interior in the case of *Kingfisher v. Wood et al.*

"Any special license to be present must have been for another and entirely different purpose. No license could be granted against the statute, and no one could successfully pervert his license or special employment to defeat the equal and just operation of the statute upon all alike. The permit was exhausted in protecting its possessor; it could not be used as a weapon against others. The moment such possessor of such special privilege formed his purpose to take advantage of his position for the selection and seizure of a tract of land, his license was valueless, and he became a trespasser from that moment. To hold that the few with permits, or especially engaged within the limits of these lands any more than those there without license, could pick out their claims in advance of the hour of the opening and pounce upon them at the very moment the signal was given to the others to start on their long race, would be to support pretension and favoritism and punish honorable obedience to authority. It is neither the law nor the equity of the case, and will not be allowed. He who, being within these lands by special authority as deputy, train hand, wagon master, or other, had the purpose to jump upon a particular tract, and who gave the evidence of his prior intent by his conduct immediately thereafter, violated this statute. Such persons had entered upon and occupied this Territory for the purpose of settlement—before the hour fixed in the proclamation—whatever license they may hold up or self-indulgent and self-deceiving pretext they may now present. They were not licensed or employed thus to defeat the law and injure their neighbors.

"Both classes were prohibited from acquiring rights to these lands: Those who were in the Territory at and before the hour designated in the proclamation without pretense or special license; and those who were there by special authority or for a special purpose, but attempted to pervert their presence to secure claims before others held on the borders could arrive, even from the most distant parts thereof.

"On the other hand, I do not think it was the intention of Congress that a man who happened to be legally in the Territory, but did not use his position to his own advantage, or to the disadvantage of his fellow citizens, should be forever prohibited from acquiring any rights in the Territory. Each case must be determined upon its own evidence and merits; but it may be generally said that the presence in the Territory before the opening, under the proclamation, and the actual settlement and entry at the land office must be so widely and obviously separated in every detail and circumstance as to render it impossible to reasonably conclude that the one was the result of the other, or in any wise dependent upon it."

As to the constitutional power of Congress to enact the law, under which appellant is held to be disqualified, there can be no doubt, and no discussion of the question would seem to be necessary at this time.

And it follows, that the district court committed no error in sustaining the demurrer to appellant's complaint and dismissing the same at the cost of the appellant, and the judgment should be affirmed.

Decree affirmed.

All the Justices concurring.